**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

FILED by _ReS_ D.C.

AUG 2 8 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT
S. D. of FLA. – MIAMI

|  |  |  |
|---|---|---|
| IN RE APPLICATION OF BLUE OIL TRADING LTD., | ) ) ) | MISC. CIVIL ACTION NO. _____ |
| In re Application for Order Pursuant to 28 U.S.C. § 1782 | ) ) ) ) ) ) | JUDGE **09 – 22549** **CIV-ALTONAGA** MAGISTRATE JUDGE BROWN |

**APPLICATION FOR DISCOVERY PURSUANT TO 28 U.S.C. § 1782**

Blue Oil Trading Ltd. ("Blue Oil") respectfully submits this application ("Application")

for an Order for discovery pursuant to 28 U.S.C. § 1782 from a person located within this

district for use in litigation before the High Court of Justice, London, England. Specifically,

Blue Oil seeks an Order permitting the issuance, by the undersigned, of the attached Subpoena In

A Civil Case seeking both testimony and documentary evidence from Mr. Virgilio Guma (a.k.a.

Virgil Guma), Sr.

**INTRODUCTION**

Blue Oil brings this Application to defend against claims seeking over $6 million in a

commercial action in the United Kingdom before the High Court of Justice. That case is

captioned *Speedway Motorsports, Inc. et al. v. Blue Oil Trading Ltd*, Folio No. 2007/1644 (the

"UK Litigation"), and is brought by Speedway Motorsports, Inc. ("SMI") and Oasis Trading

Group, LLC ("Oasis") (collectively, "Plaintiffs"). In the UK Litigation, Plaintiffs allege, *inter*

*alia*, that Blue Oil (and certain other) entities breached a memorandum of understanding

("MOU") and other agreements between the parties by failing to pay Plaintiffs the proper share

of profits generated by the parties' oil trading and distribution business in Guatemala; Blue Oil

has counterclaimed that Plaintiffs owe Blue Oil (and its affiliates) up to approximately $4.6

million. Documents and testimony from Mr. Virgilio Guma - a non-party to the UK Litigation living in this judicial district - are directly relevant to the claims and counterclaims in the UK Litigation; as explained below and in the accompanying Declaration of Anna Maxwell, Blue Oil's UK solicitor, Mr. Guma was directly involved in the negotiation and execution of the MOU, and was also involved in the operation of the parties' business after the MOU was finalized. This discovery is expressly permitted by 28 U.S.C. § 1782.

## I.    FACTUAL BACKGROUND FOR THE APPLICATION

### Interested Parties and Jurisdictional Basis

1.    Speedway Motorsports, Inc., is a Delaware corporation with its principal place of business in Charlotte, North Carolina, (Declaration of Anna Maxwell, dated August 26, 2009 ("Maxwell Decl.") Ex. A ¶ 1), and Oasis Trading Group, LLC, is a Georgia corporation with its principal place of business in Alpharetta Georgia.

2.    These two Plaintiffs sued Blue Oil, a British Virgin Islands corporation based in Tortola, British Virgin Islands, and Corporación Arcenillas S.A., Ecopetroleos S.A. and Blue Oil S.A., all Guatemala corporations based in Guatemala City (all four, collectively, "Defendants") (Maxwell Decl. Ex. B ¶ 4).

### The Party from whom Discovery is Sought

3.    Mr. Virgilio Guma, Sr. from whom Blue Oil seeks discovery to defend itself in the UK Litigation, is a United States citizen and resides in Coral Gables, Florida.

4.    Mr. Guma was a consultant and advisor to Oasis, providing expertise in Latin American business, during the negotiation of the business relationships described below.

**The Memorandum of Understanding and Contract**

5.       On May 6, 2005, Oasis entered into a Memorandum of Understanding ("MOU"),

on its own behalf and on behalf of SMI, with Blue Oil.  (Maxwell Decl. Ex. A ¶ 8; Ex. B ¶ 6).

6.       The MOU contemplated that Plaintiffs would purchase hydrocarbon products and

sell them to Blue Oil, which would in turn sell them to a Guatemalan third party (Maxwell Decl.

Ex. A  ¶ 9(a); Maxwell Decl. Ex. B ¶ 7(b)).  Due to changes in Guatemalan law, the structure of

the parties' sales was modified during the course of their dealings under the MOU (Maxwell

Decl. Ex B ¶ 9).

7.       Plaintiffs claim that they are entitled to a payment of over $2.4 million from Blue

Oil under the MOU (Maxwell Decl. Ex. A ¶ 16).

8.       The MOU was superseded by a Contract (with the MOU, the "Agreements")

between Plaintiffs and Defendants on December 2, 2005. (Maxwell Decl. Ex. A ¶ 21; Maxwell

Decl. Ex. B ¶¶ 14(a), 20).

9.       The Contract also provided for the sale of hydrocarbon products by the parties

through a chain of transactions ending with a purchaser on the Guatemalan market. (Maxwell

Decl. Ex. A ¶ 22; Ex. B ¶ 24).

10.      The parties amended the Contract on May 25, 2006, (Maxwell Decl. Ex. A ¶30;

Maxwell Decl. Ex. B ¶ 26), and again through an amendment effective December 22, 2006

(Maxwell Decl. Ex. A ¶ 35; Maxwell Decl. Ex. B ¶ 28).

11.      Plaintiffs claim that Defendants are in breach of the Contract and its two

amendments because they have not agreed to Plaintiffs' demands for payments under the

Contract and its amendments of nearly $3 million (Maxwell Decl. Ex. A ¶ 37).  Defendants are

in fact entitled to payment *by Plaintiffs* of up to approximately $4.6 million. *See* Maxwell Decl.
Ex. B ¶¶ 30(b), 35, 37.

**Mr. Guma's Involvement**

12.     Though not a party to the UK Litigation, Mr. Guma's actions and knowledge are
highly material to that case.

13.     Mr. Guma was retained by Oasis to serve as a consultant, and was directly
involved in the negotiations and performance of the Agreements. *See* Maxwell Decl. Ex. D.
For example, Mr. Guma was involved in the parties' business after Guatemalan tax law changed
and the parties were obliged to pay Guatemala taxes and import the product into Guatemala. Mr.
Guma's documents and testimony will therefore provide valuable evidence concerning the
intended split of profits arising from the venture, the proper allocation of costs and expenses as
between the parties, and the parties' course of performance under the Agreements. Each of these
issues is directly relevant to the UK Litigation.

I.     **LEGAL ANALYSIS**

A.     **THE APPLICATION MEETS 28 U.S.C. § 1782's STATUTORY REQUIREMENTS**

Under 28 U.S.C. § 1782(a):

> The district court of the district in which a person resides or is
> found may order him to give his testimony or statement or to
> produce a document or other thing for use in a proceeding in a
> foreign or international tribunal . . . . The order may be made . . .
> upon the application of any interested person and may direct that
> the testimony or statement be given, or the document or other thing
> be produced, before a person appointed by the court. By virtue of
> his appointment, the person appointed has power to administer any
> necessary oath and take the testimony or statement. . . . To the
> extent that the order does not prescribe otherwise, the testimony or
> statement shall be taken, and the document or other thing
> produced, in accordance with the Federal Rules of Civil Procedure.

An applicant seeking discovery under § 1782(a) must show that:  (a) the applicant is "any interested person," (b) the request seeks evidence in the form of testimony and/or documents, (c) the discovery is for use in a proceeding before a foreign "tribunal," and (d) the discovery is sought from a person residing or found in this district.  *In re Clerici*, 481 F.3d 1324, 1332 (11th Cir. 2007). These elements are satisfied here.

The first element, which requires that the applicant be an "interested person" before the foreign tribunal, is satisfied if the applicant is an actual party before the foreign tribunal. *In re Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago*, 848 F.2d 1151, 1155 (11t Cir. 1988); *see also In re Kang*, 2007 U.S. Dist. LEXIS 46135 (S.D. Fla. June 26, 2007) (plaintiff in foreign proceeding was "interested person" for purposes of § 1782 application).  Blue Oil is a Defendant and has appeared in the UK Litigation before the High Court of Justice, London, England, and as such is an "interested person" for purposes of § 1782(a).

The second and third elements are also clearly met.  The second element is met as the Application seeks only testimony and documents, both permissible discovery under § 1782(a).  Also, the third element is met in that the discovery is specifically for use in the UK Litigation, which is a currently pending "proceeding in a foreign or international tribunal" under § 1782(a). *In re Clerici*, 481 F.3d at 1332-1333.  Federal courts have routinely concluded that the courts of England are "tribunals" under § 1782. *E.g., In re Request From the United Kingdom Pursuant to the Treaty Between the United States of Am. and the Gov't of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters in the matter of Easier, PLC*, 2007 U.S. Dist. LEXIS 82033 (M.D. Fla. Nov. 5, 2007).  Finally, the last element is unquestionably met since Mr. Guma resides within this district.

Because Blue Oil has satisfied all statutory elements of § 1782, this Court has jurisdiction to order the relief requested.

## B.    GIVEN THE PRESENT CIRCUMSTANCES, A GRANT OF DISCOVERY UNDER § 1782 IS APPROPRIATE

Once a court has determined that the statutory requirements have been met, the Court may exercise its discretion as to whether to grant the requested discovery.

The Supreme Court has identified several non-exclusive factors that a district court may take into account in deciding whether to grant an application under § 1782:  (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding [in which case] the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad"; (2) the "nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";  (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States";  and (4) whether the discovery requests should be scaled back to avoid undue burden. *Intel*, 542 U.S. at 264-65.

Here, each of these factors weighs in favor of granting discovery under § 1782.

### 1.    Mr. Guma Is Not a Party to the UK Litigation

Mr. Guma is not a party to the proceedings in the UK Litigation, and Plaintiffs in the UK Litigation have taken the position that he is not their employee.  Further, though they have made unspecified "inquiries" of Mr. Guma, they have failed to produce any documents from him.

### 2.    The Foreign Tribunal Is Receptive to Assistance

The foreign tribunal, the High Court of Justice, London, England, is the court of first instance in England in which civil actions are brought by private litigants for damages.

(Maxwell Decl. ¶ 17). The UK Litigation is the English counterpart to a civil action that would be commenced here in a federal district court or state trial court. (Maxwell Decl. ¶ 18). Moreover, the English courts have in the past been receptive to the assistance of the courts of the United States. (Maxwell Decl. ¶ 19); *see also In re Request from the United Kingdom*, 2007 U.S. Dist. LEXIS 82033, at *6 (noting fact that "United Kingdom reciprocates assistance to the United States when it requires federal court judicial assistance weigh[s] in favor of granting the application"); *In re Phillips*, 2004 U.S. Dist. LEXIS 16426, at *6-7 (S.D.N.Y. Aug. 19, 2004) (granting discovery application for use in action in High Court of Justice in England and finding "no reason to suppose that the government of the United Kingdom would disfavor granting Applicants relief under § 1782"); *see generally Intel Corp v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 261-261 (2004) (citing case in which "House of Lords ruled that nondiscoverability under English law did not stand in the way of a litigant in English proceedings seeking assistance in the United States under § 1782) (citing *South Carolina Ins. Co.* v *Assurantie Maatschappij "De Zeven Provincien" N. V.*, [1987] 1 App. Cas. 24).

### 3.    The Application Is Not An Attempt to Circumvent Restrictions

The Application is not an attempt to circumvent foreign evidence-gathering restrictions. Instead, Blue Oil brings this Application only after Plaintiffs in the UK Litigation failed to produce any materials from Mr. Guma. (Maxwell Decl. ¶ 21).

In addition, the Supreme Court in *Intel* specifically rejected the foreign-discoverability rule for application of § 1782. *Intel*, 542 U.S. at 260. The *Intel* court found "nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there"—"[a] foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions –

reasons that do not necessarily signal objection to aid from the United States federal courts. *Id.* at 261. The *Intel* court also noted that many foreign "civil-law systems lack procedures analogous to the pretrial discovery regime operative under the Federal Rules of Civil Procedure." *Id.* at 262 n.12.

Thus, a party is not necessarily seeking to circumvent foreign proof-gathering restrictions simply when such discovery is unavailable under the law of the foreign tribunal. *E.g., In the Matter of the Application of The Proctor & Gamble Co.*, 334 F. Supp. 2d 1112 (E.D. Wis. 2004) (granting § 1782 request); *see also In re Kang*, 2007 U.S. Dist. LEXIS 46135, at *4 (finding no attempt to circumvent and acknowledging safeguard against such circumvention where "unduly intrusive or burdensome requests may be rejected or trimmed"). "Rather, to decline a § 1782(a) request based on foreign nondiscoverability, a district court must conclude that the request would undermine a specific policy of a foreign country or the United States." *Id.*, 334 F. Supp. 2d at 1116 (citing *Intel*, 542 U.S. at 2483).

Here, no specific policy of the United Kingdom or the United States is being undermined. The discovery requested is relevant, limited and is not offensive to the English court system—which will have the ultimate say as to whether the discovery is admissible. *In re Phillips*, 2004 U.S. Dist. LEXIS 16426, at *6 n.3.

### 4.     The Requests Do Not Impose an Undue Burden

The requests are narrowly tailored to obtain information that Blue Oil needs to defend itself. Plaintiffs assert that Blue Oil breached the MOU and other agreements entered into between parties and failed to pay profits due under such agreements. (Maxwell Decl. ¶ 4). To defend against those allegations, Blue Oil seeks: (i) to discover documents in the possession of Mr. Guma related to the negotiation and execution of the agreements and any communications

concerning the agreements and the operation of the parties' business and (ii) to depose Mr. Guma concerning there issues. (*See* attached Subpoena Duces Tecum and Ad Testificandum to Mr. Virgilio A. Guma, Sr.) Such information and any other knowledge held by Mr. Guma is central to Blue Oil's ability to defend the relevant claims.

a.    Blue Oil's document requests are relevant and narrowly tailored

Blue Oil has narrowly tailored the document requests in the subpoena to seek only documents that are relevant to Blue Oil's defenses (and counterclaims) in the UK Litigation.

Document Requests No. 1 and No. 2 seek documents concerning the Memorandum of Understanding (therein referred to as the "MOU") and the Agreements entered into on December 2, 2005 (and all amendments thereto), respectively. Those documents would provide detail as to the negotiation and execution of the MOU and Agreements and reveal the parties' intentions and understanding as to the terms of the documents and the intended split of profits. As such, they would be highly relevant to Plaintiffs' claims (and the defenses thereto) in the UK Litigation.

Document Requests No. 3 and No. 4 seeks documents concerning the Defendants and Plaintiffs, respectively. Those documents would provide evidence as to the relationship between the parties generally, and specifically as to the MOU and the Agreements as well as any due diligence undertaken and internal communications. As such, the documents would help demonstrate the parties' intentions and relationship throughout the transaction at issue in the UK Litigation.

Document Request No. 5 asks for "documents concerning Alka Wenker, Mario Brol, Augusto Estrada, Matias Rojas, Max Beckett, William Brooks, David Blihovde, Michael Hodge, Chet Fream or Laymon Harrison." These documents are relevant because these individuals were integrally involved with the transactions at issue in the UK Litigation. As such, documents

related to such individuals would provide evidence as to the parties' relationship, intentions, and understanding of the venture.

Document Request No. 6 asks for "documents sufficient to show all compensation received, directly or indirectly" by Mr. Guma or any entity controlled by Mr. Guma. Such documents would provide direct evidence as to the relationship between Plaintiffs and Mr. Guma and his involvement with the transaction, and thus, the requested documents are relevant to the issues involved in the UK Litigation.

        b.      Blue Oil's deposition topics are relevant and narrowly tailored

Blue Oil has requested Mr. Guma testify about: (1) the MOU and documents concerning the MOU, (2) the Agreements and documents concerning the Agreements, (3) Defendants and documents concerning the Defendants, (4) Plaintiffs and documents concerning the Plaintiffs, (5) Alka Wenker, Mario Brol, Augusto Estrada, Matias Rojas, Max Beckett, William Brooks, David Blihovde, Michael Hodge, Chet Fream or Laymon Harrison and all documents concerning such individuals, and (6) Compensation received, directly or indirectly, by Mr. Guma from Plaintiffs, and documents showing such.

Each of these categories would provide evidence, through the testimony of Mr. Guma, who worked as a consultant for Plaintiffs and was directly involved in the negotiation and performance of the Agreements, as to the negotiations and execution of the transaction. Specifically, these categories would evidence the parties' understanding as to the intended split of profits arising from the venture, the proper allocation of costs and expenses as between the parties, and the parties' course of performance under the Agreements. Each of these issues is directly relevant to the UK Litigation.

      c.      <u>The requested documents are not otherwise available to Blue Oil</u>

Blue Oil is currently unable to obtain these documents and testimony—information in which Blue Oil has a legitimate interest for its defense. (Maxwell Decl. ¶¶ 16, 21). Moreover, because Mr. Guma is present in this district, the Court can order him to produce documents under § 1782(a) even if some of those documents may be located outside this district—or even outside the country. *E.g., In re Gemeinschaftspraxis Dr. Med. Schottforf*, 2006 WL 3844464 *5 (S.D.N.Y. Dec. 29, 2006) (extra-territorial location of documents requested under § 1782 did not preclude relief).

      d.      <u>Authorizing the requested discovery is consistent with the comity between U.S. and English tribunals</u>

Courts have concluded that § 1782 discovery should be granted if doing so would further the "twin" aims of the statute: (a) to provide an efficient means of assistance to participants in international litigation, and (b) to encourage foreign countries, by example, to provide similar means of assistance to United States courts and litigants in American courts. *See, e.g.*, *In re Application of Euromepa*, 51 F.3d 1095, 1097, 1101 (2d Cir. 1995). Both aims would be furthered by granting this Application.

*First*, as described above, the proposed discovery seeks information that goes to the core of many of the Plaintiffs' allegations in the UK Litigation, as well as to Blue Oil's defenses to the claims being made against it. *Second*, granting the Application would encourage foreign countries, by example, to provide similar means of assistance to United States courts and litigants in American courts. England has, through treaties with the United States, demonstrated a mutual interest in cooperation in the exercise of justice. (Maxwell Decl. ¶ 20). Granting this

Application would foster the exchange of judicial assistance consistent with the purposes of §

1782 and the Hague Convention.

Accordingly, issuance of the subpoena on an *ex parte* basis is appropriate and will not

prejudice the rights of the subpoenaed party. *See, e.g.*, *In re Clerici*, 481 F.3d at 1329-30

(approving grant of *ex parte* order the day after the § 1782 application was filed); *Application of*

*Gianoli*, 3 F.3d 54, 55 (2d Cir. 1993) (same); *In re Trinidad and Tobago*, 848 F.2d 1151, 1152

(11th Cir. 1988) (same).[1]

## CONCLUSION

Based on the foregoing, Blue Oil Trading Ltd. respectfully requests that the Court grant

the relief requested.  A proposed order is attached.

Dated: August 28, 2009                    Respectfully submitted,


                                          PETROS & ELEGANT

                                          By: _____
                                               Justin B. Elegant
                                               jbelegant@petroslaw.com
                                          4090 Laguna Street, Second Floor
                                          Coral Gables, Florida 33146
                                          (305) 446-3699

                                          *Attorneys for Blue Oil Trading, Ltd.*

---

[1]        District courts have regularly promoted efficiency and preserved all parties' ability to contest any disputed issues by issuing subpoenas under § 1782 *ex parte* and subsequently allowing interested persons the opportunity to file motions to quash.  *See, e.g.*, *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf*, Slip Op., 2006 WL 3844464 (S.D.N.Y., Dec. 29, 2006); *In re Application of Hill*, 2005 WL 1330769 (S.D.N.Y. June 3, 2005).  In the alternative, the Court could allow Mr. Guma and Plaintiffs to file Responses to the Application, allow Blue Oil to file a Reply and hold a hearing on the Application.  *E.g.*, *In re Merck & Co., Inc.*, 197 F.R.D. 267, 271 (M.D.N.C. 2000).

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

In re Application of Blue Oil Trading Ltd.

V.

For Order Pursuant to 28 U.S.C. § 1782 Directing Issuance of a Subpoena to Virgilio A. Guma, Sr.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]

TO: Virgilio A. Guma, Sr.
1203 Ferdinand St.
Coral Gables, FL 33134

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Petros & Elegant, 4090 Laguna St., Coral Gables, FL (See Schedule B) | September 29, 2009 10:00 a.m. EST |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Schedule A

| PLACE | DATE AND TIME |
|---|---|
| Petros & Elegant, 4090 Laguna St., Coral Gables, FL (Attn: Justin Elegant) | September 14, 2009 9:30 a.m. EST |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| | August 28, 2009 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Justin B. Elegant, Esq.
Petros & Elegant, 4090 Laguna St., Coral Gables, FL (Tel: 305-446-3699)

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1]If action is pending in district other than district of issuance, state district under case number.

American LegalNet, Inc.
www.USCourtForms.com

AO 88 (Rev 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE<br>SERVED: | PLACE |
|---|---|

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

American LegalNet, Inc.
www.USCourtForms.com

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

American LegalNet, Inc.
www.USCourtForms.com

### SCHEDULE A

I.   <u>**DEFINITIONS AND INSTRUCTIONS**</u>

A.   For purposes of interpreting or construing the scope of these definitions, instructions, and requests, the terms used shall be given their most expansive and inclusive interpretation.

B.   The term "documents" as used herein shall have the broadest reasonable meaning and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any mechanical or electronic process, or written or produced by hand, namely: agreements; contracts; communications, including intracompany communications; correspondence; letters; telegrams; telexes; teletypes; memoranda; record books; notes; drawings; reports; opinions; electronic mail (including any primary or back-up files); minutes, summaries, notes, memoranda, or other records of personal conversations, interviews, meetings or telephone calls; diaries; dayplanner entries; electronic calendar entries (including any primary or back-up files); forecasts; statistical statements; cost summaries; accountants' or bookkeepers' work papers, graphs, charts or accounts; logs; analytical records; reports, notes, memoranda, summaries, or other records of investigations; audit reports; opinions or reports of consultants' appraisals; trade letters; notices; projections; working papers; invoices, front and back, and any attachments thereto; or any other documents or writing of whatever description, including, but not limited to, any information contained in any form whatsoever (including, without limitation, in electronic form on a computer or portable electronic storage device, such as a "thumb" drive, although not yet in printed form) in the possession, custody or control of you, your agents, or any other persons acting or purporting to act on your behalf.  These definitions include drafts of all

"documents" regardless of whether they were executed or not, to the extent such drafts differ from other produced documents.

C.      "Including" shall be construed to mean "including, but not limited to" and shall be construed as a term of inclusion, not exclusion.

D.      "Concerning" means relating to, referring to, reflecting, describing, mentioning, evidencing, or constituting.

E.      The terms "and" and "or" used in any request in the disjunctive or conjunctive shall be read as necessary to make the request more inclusive.

F.      Any singular form of any word shall be construed to include the plural and any plural form shall be read to include the singular.

G.      Any past tense of a verb shall be construed to include the present tense and any present tense shall be construed to include the past tense.

H.      The term "document" or "documents" shall mean the original and all copies thereof which are different in any way from the original (whether by interlineation, receipt stamp notation, indication of copies sent or received, or otherwise) and all attached or annexed materials to any written, typewritten, handwritten, printed, graphic, photographic or recorded material as well as all computer e-mails, instant messages, data files, Web pages, tapes, disks, inputs or outputs, and other computer-readable records or programs, transcripts and copies and reproductions thereof, however produced or reproduced, now or at any time in your actual or constructive possession, custody or control.  The terms "document" or "documents" shall specifically include, but shall not be limited to, correspondence, e-mails, instant messages, telegrams, facsimiles, telexes, memoranda, memoranda or records of meetings, reports, studies, transcripts, indexes, accounting records of any kind, including bank examination reports whether

state or federal, filings, records, charts, tabulations, lists, analyses, graphs, diagrams, estimates, minutes (including board and loan committee minutes), tapes, photographs and photographic films, sound recording tapes, phonographic records, video tapes, compact disks, CD-ROMs, data compilations from which information can be obtained or can be translated into a form reasonably useable, as well as any contracts or agreements, and records of every kind and type, including any information formerly or presently kept by any method of electronic data processing or magnetic tape storage medium, including the printed output of any such electronic data processing equipment or magnetically stored information.

I.       The term "person" means any natural person, association, corporation, partnership, government (or government agency, bureau, or department), quasi-public entities, proprietorship, joint venture, trust, estate, and all other form of legal entity.

J.       The term "thing" means all tangible or intangible property not otherwise defined as a document.

K.       The term "communication" means any writing, or oral conversation, including, but not limited to, telephone conversations and meetings, Internet conferences, teleconferences, letters, e-mails, instant messages, facsimiles, memoranda, telegraphic communications, and telex communications.

L.       The term "produce" means to make available the document or things requested herein for inspection and copying, and to separate such documents into and label them to correspond with the categories set forth in these requests.

M.       The term "Defendants" refers to Blue Oil Trading Ltd., Corporación Arcenillas S.A., Ecopetroleos S.A., and Blue Oil S.A., and their respective officers, directors, employees, agents, predecessors and successors.

N.      The term "Plaintiffs" refers to Speedway Motorsports, Inc. and Oasis Trading Group, LLC, and their officers, directors, employees, agents, predecessors and successors.

O.      The term "You" means Virgilio A. Guma, Sr., or any other person controlled by Virgilio Guma.

P.      The term "MOU" means the memorandum of understanding entered into between Oasis Trading Group, LLC, Speedway Motorsports, Inc. and Blue Oil Trading Ltd. in 2005.

Q.      The term "Agreements" means the agreement dated December 2, 2005 (and any amendments thereto).

R.      To the extent that you consider any of the following requests objectionable, respond to so much of each and every part thereof which is not objectionable in your view, and separately state that part of each which is objectionable and the ground for each objection.

S.      If you object to any discovery request on the basis of attorney-client privilege, work-product doctrine, or any other privilege, state the privilege claimed, and identify the documents or communications for which such privilege is claimed, stating the following:

      i.     The date of the document or communication;
      ii.    The description of the document or communication protected, including the identity of all persons present or all persons who authored, transmitted or received a copy of such communication, and the number of pages, if written;
      iii.   The subject matter of the document or communication; and
      iv.   The basis on which the privilege is claimed.

T.      You are requested to produce for inspection and copying the documents described below at the office of the undersigned attorneys on or by September 14, 2009, or at some other time as may be agreed to.

## II.   <u>DOCUMENTS AND THINGS TO BE MADE AVAILABLE</u>

1.    All documents concerning the MOU.

2.    All documents concerning the Agreements.

3.    All documents concerning Defendants.

4.    All documents concerning Plaintiffs.

5.    All documents concerning Alka Wenker, Mario Brol, Augusto Estrada, Matias Rojas, Max Beckett, William Brooks, David Blihovde, Michael Hodge, Chet Fream or Laymon Harrison.

6.    Documents sufficient to show all compensation received, directly or indirectly, by You from Plaintiffs.

## SCHEDULE B

Capitalized terms have the same definitions as in Schedule A.  Virgilio A. Guma, Sr.

(a.k.a. Virgil Guma), is requested to testify about the following subjects:

1.      The MOU and documents concerning the MOU.

2.      The Agreements and documents concerning the Agreements.

3.      Defendants and documents concerning the Defendants.

4.      Plaintiffs and documents concerning the Plaintiffs.

5.      Alka Wenker, Mario Brol, Augusto Estrada, Matias Rojas, Max Beckett, William Brooks, David Blihovde, Michael Hodge, Chet Fream or Laymon Harrison and all documents concerning such individuals.

6.      Compensation received, directly or indirectly, by You from Plaintiffs, and documents showing such.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| IN RE APPLICATION OF BLUE OIL TRADING LTD., | ) ) ) | MISC. CIVIL ACTION NO. _____ |
| In re Application for Order Pursuant to 28 U.S.C. § 1782 | ) ) ) ) ) | JUDGE _____ |

## DECLARATION

I, Anna Maxwell, declare under penalty of perjury the following:

1.      I am a partner with the law firm of Bond Pearce LLP, counsel to Blue Oil Trading Ltd. ("Blue Oil") in this matter and in the underlying action in the United Kingdom before the High Court of Justice. That case is captioned *Speedway Motorsports, Inc. et al. v. Blue Oil Trading Ltd,* Folio No. 2007/1644 (the "UK Litigation").

2.      I submit this Declaration in support of Blue Oil's application to this Court under 28 U.S.C. § 1782 ("Application").

3.      The statements in this declaration are either (i) undisputed background facts; (ii) statements of fact made by the parties in the UK Litigation and other proceedings (supported by the exhibits attached hereto) or (iii) publicly available information. I provide these facts as background for the Application.

4.      The UK Litigation brought by Speedway Motorsports, Inc. ("Speedway") and Oasis Trading Group, LLC ("Oasis") (collectively, "Plaintiffs") alleges, *inter alia*, that Blue Oil (and certain other) entities breached a memorandum of understanding ("MOU") and other agreements between the parties by failing to pay Plaintiffs' the proper share of profits generated by the parties' oil trading and distribution business in Guatemala; Blue Oil has counterclaimed

Exhibit "A"

that Plaintiffs owe Blue Oil (and its affiliates) up to approximately $4.6 million. Attached hereto as Exhibit A is Plaintiffs' Re-Amended Particulars of Claim, dated May 1, 2009; Exhibit B is Defendants' Re-Amended Defence and Counterclaim, dated May 26, 2009; and Exhibit C is Plaintiffs' Amended Reply and Defence to Counterclaim, dated June 17, 2009.

5.      On May 6, 2005, Oasis entered into a Memorandum of Understanding ("MOU"), on its own behalf and on behalf of Speedway, with Blue Oil. (Ex. A ¶ 8; Ex. B ¶ 6).

6.      The MOU contemplated that Plaintiffs would purchase hydrocarbon products and sell them to Blue Oil, which would in turn sell them to a Guatemalan third party. (Ex. A ¶ 9(a); Ex. B ¶ 7(b)). Due to changes in Guatemalan law, the structure of the parties' sales was modified during the course of their dealings under the MOU. (Ex B ¶ 9).

7.      Plaintiffs claim that they are entitled to a payment of over $2.4 million from Blue Oil under the MOU. (Ex. A ¶ 16).

8.      The MOU was superseded by a Contract (with the MOU, the "Agreements") between Plaintiffs and Defendants on December 2, 2005. (Ex. A ¶ 21; Ex. B ¶¶ 14(a), 20).

9.      The Contract also provided for the sale of hydrocarbon products by the parties through a chain of transactions ending with a purchaser on the Guatemalan market. (Ex. A ¶22; Ex. B ¶ 24).

10.     The parties amended the Contract on May 25, 2006, (Ex. A ¶30; Ex. B ¶ 26), and again through an amendment effective December 22, 2006 (Ex. A ¶ 35; Ex. B ¶ 28).

11.     Plaintiffs claim that Defendants are in breach of the Contract and its two amendments because they have not agreed to Plaintiffs' demands for payments under the Contract and its amendments of nearly $3 million, and separately, some $730,000. (Ex. A ¶ 37).

12.     Defendants are in fact entitled to payment by Plaintiffs of a sum up to approximately $4.6 million. *See* Ex. B ¶¶ 30(b), 35, 37.

13.     Mr. Virgilio Guma, Sr. (a.k.a. Virgil Guma) is a non-party to the UK Litigation. Mr. Guma is a citizen of Florida and resides in Coral Gables, Florida.

14.     Mr. Guma was retained by Oasis to serve as a consultant, and was directly involved in the negotiations and performance of the Agreements. *See* Email from David Blihovde to Bill Brooks, et. al., dated September 28, 2005, attached hereto as Exhibit D.

15.     For example, Mr. Guma was involved in the parties' business after Guatemalan tax law changed and the parties were obliged to pay Guatemala taxes and import the product into Guatemala. Mr. Guma's documents and testimony will therefore provide valuable evidence concerning the intended split of profits arising from the venture, the proper allocation of costs and expenses as between the parties, and the parties' course of performance under the Agreements. Each of these issues is directly relevant to the UK Litigation.

16.     Plaintiffs in the UK Litigation have taken the position that Mr. Guma is not their employee. Further, though Plaintiffs have made unspecified "inquiries" of Mr. Guma, they have failed to produce any documents from him.

17.     The foreign tribunal, the High Court of Justice, London, England, is the court of first instance in England in which civil actions are brought by private litigants for damages.

18.     The UK Litigation is the English counterpart to a civil action that would be commenced here in a federal district court or state trial court.

19.     The English courts have in the past been receptive to the assistance of the courts of the United States.

20.     England has, through treaties with the United States, demonstrated a mutual interest in cooperation in the exercise of justice.

21.     Blue Oil brings this Application only after Plaintiffs in the UK Litigation failed to produce any materials from Mr. Guma.

22.     Blue Oil is currently unable to obtain these documents and testimony—information in which Blue Oil has a legitimate interest for its defense.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 26 day of August, 2009.


<span>Anna Maxwell</span>

IN THE HIGH COURT OF JUSTICE                    Folio No. 2007/1644
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

B E T W E E N:

(1)    SPEEDWAY MOTORSPORTS, INC.

(2)    OASIS TRADING GROUP, LLC

**Claimant**

-and-

(1)    BLUE OIL TRADING LTD

(2)    CORPORACION ARCENILLAS S.A.

(3)    ECOPETROLEOS S.A.

(4) BLUE OIL S.A.

**Defendants**

---

### RE-AMENDED PARTICULARS OF CLAIM

---

**The Parties**

1.     The First Claimant, Speedway Motorsports, Inc. is, and was at all material times, a Delaware corporation, listed on the New York Stock Exchange, engaged in the business, *inter alia*, of the supply of hydrocarbon products such as gasoline and diesel fuel. Its principle business address is 5401 East Independence Boulevard, Charlotte, North Carolina 28212, USA, and its registered address is CT Corporation System, 225 Hillsborough Street, Raleigh North Carolina 27603, USA.

2.     The Second Claimant, Oasis Trading Group, LLC. is, and was at all material times, a limited liability company registered in Georgia, engaged in the business of hydrocarbon product trading. Its registered address is 11675 Rainwater Drive, Suite 250, Alpharetta, Georgia 30004, USA.

- 1 -

"Maxwell Decl. Ex. A"

3.     The First Defendant, Blue Oil Trading Ltd, is and was at all material times, a private British Virgin Islands company, engaged in the petroleum business. Its registered address is believed to be Chera Chambers, Road Town, Tortola, British Virgin Islands.

4.     The Second Defendant, Corporacion Arcenillas S.A., is and was at all material times, a private Guatemalan company, engaged in the importation of hydrocarbon products into Guatemala. Its registered address is believed to be 15 Avenida 17-40 zona 13, Edificio Tetra Centra, $7^0$ nivel, Guatemala City, Guatemala.

5.     The Third Defendant, Ecopetroleos S.A., is and was at all material times, a private Guatemalan company, engaged in the wholesale and distribution of hydrocarbon products throughout Guatemala. Its registered address is believed to be 15 Avenida 17-40 zona 13, Edificio Tetra Centra, $7^0$ nivel, Guatemala City, Guatemala.

6.     The Fourth Defendant, Blue Oil S.A., is and was at all material times, a private Guatemalan company, engaged in the wholesale and distribution of hydrocarbon products throughout Guatemala. Its registered address is believed to be 15 Avenida 17-40 zona 13, Edificio Tetra Centra, $7^0$ nivel, Guatemala City, Guatemala.

7.     The Defendants are all corporate affiliates, and each is controlled by the same individuals, Matias Rojas (a resident of England) and Max Beckett. The First through Third Defendants shall be referred to herein as the "Primary Defendants".

**The Memorandum of Understanding**

8.     On 6 May 2005 the Second Claimant (on behalf of the First Claimant) entered into a memorandum of understanding, on its own behalf and on behalf of the First Claimant, with the First Defendant (the "**MOU**"). The MOU was expressed to be legally binding and to be governed by and construed in accordance with the laws of England and Wales. It also contained a submission by the parties thereto to the jurisdiction of the English courts for the purposes of resolving any arising disputes.

9.     Pursuant to the terms off the MOU it was agreed that:

(a)    The Claimants would finance the purchase of hydrocarbon products and sell them (on a deferred payment basis, i.e. when an on-sale had been made) to the First Defendant, who would then on-sell the products to 'Alka Wenker', a distributor of hydrocarbon products in Guatemala. This second sale would be made pursuant to an existing sales contract between Alka Wenker and the First Defendant, the terms of which were to dictate (i.e. be back to back with) the terms of the sale contract between the Claimants and the First Defendant; and

(b)    The pre-tax profits (net only of "direct costs" of the sort referred to at Clause (I) of the MOU) generated by such operations were to be split on a 60%/40% basis, with the Claimants receiving 60% and the First Defendant receiving 40% (in this regard, see Clauses (H) and (I) of the MOU).

10.    However, in the circumstances set out by the Defendants at paragraph 8(b) and (c) of their Amended Defence:

(a)    The parties agreed that from 5 June 2005 to 29 June 2005, the Claimants would supply the hydrocarbons to the Second Defendant (rather than the First Defendant) which would then sell them to Alka Wenker for on-sale to the local Guatemalan market;

(b)    The parties subsequently agreed that from 30 June 2005 to 13 November 2005, the Claimants would supply the hydrocarbons to the Second Defendant, which would then sell them to the Third Defendant (rather than Alka Wenker) which would then on-sell them to the local Guatemalan market; and

(c)    The parties subsequently agree that from 14 November 2005 until the supersession of the MOU, the Claimants would supply the hydrocarbons to the First Defendant, which would sell them to the Second Defendant who, in turn, would sell them to the Third Defendant, which would then on-sell them to the local Guatemalan market.

11.     The effect of each such agreement was on each occasion, to vary the MOU so as to make the Second Defendant and Third Defendant a party thereto and to reflect and permit the revised sales chain (in each case starting with the sale by the Claimants), such that:

   (a)     The "profits generated by each operation" (as referred to in Clause (H) of the MOU) was a reference to the profits generated:

      (i)     From 5 June 2005 to 29 June 2005, at each step in the chain up to and including the sale to Alka Wenker.

      (ii)    From 30 June 2005 to 13 November 2005, at each step in the chain up to and including the sale to the local Guatemalan market.

      (iii)   From 14 November to the supersession of the MOU, at each step in the chain up to and including the sale to the local Guatemalan market.

   (b)     Alternatively, there was an implied term of the MOU as varied on each occasion (to be implied as a matter of obvious inference and/or business efficacy) that the profits referred to in sub-paragraphs 11(1)(i), (ii) and (iii) above were to be taken into account.

12.     In the alternative to the case in paragraph 11 above, the Primary Defendants are estopped by convention from contending that the profits referred to in sub-paragraphs 11(a)(i), (ii) and (iii) are not to be taken into account under the MOU, it having been the common assumption of the parties that they would be so included (as outwardly reflected, for example, in accounting documents passing between the parties) and the Claimants having proceeded on the basis of that assumption (not least in agreeing to the changes in the chain as described above).

13.     In the alternative to the case in paragraphs 11 and 12 above, the effect of each such agreement as is referred to in paragraph 10 above was, on each occasion, to vary the MOU so as to reflect and permit the revised sales chain (in each case starting with the sale by the Claimants), such that, pursuant to Clause (B) as so varied, the terms

- 4 -

of each sales contract in the revised sales chain (ending with the sale to the final entity in the chain prior to sale to the local Guatemalan market) were required to be back to back (in particular as to price).

14.   As further set out below, the parties subsequently entered into the Contract which superceded the MOU. In those circumstances and in circumstances where the parties were unable to agree the final sum payable under the MOU, the parties agreed that they would postpone final reconciliation (and consequent payment) under the MOU until such time as they sought to reconcile the final account under the Contract.

15.   As further set out below, the time for reconciliation of the final account between the parties has long since arisen but the parties have still been unable to agree on the sums payable under the MOU.

16.   Based on the information which has been made available to them, the amount which is payable (or which the Primary Defendants are estopped from denying is payable) by the Primary Defendants and due (being still unpaid) under the MOU as the Claimants' 60% share of the relevant (as set out in paragraphs 11 and 12 above) pre-tax profits (after deduction only of direct costs of the sort referred to in Clause (I) of the MOU) is US$2,453,829. The Claimants reserve the right to amend that figure following disclosure.

17.   Further or alternatively, wrongfully and in breach of the MOU the Primary Defendants have refused to pay the said sum to the Claimants and the Claimants have thereby suffered loss and damage in the like amount.

18.   If, contrary to the Claimants' case as set out in paragraphs 11 and 12 above, the profits referred to in sub-paragraphs 11(1)(i), (ii) and (iii) are not to be taken into account and the Primary Defendants are not estopped from denying that they are to be taken into account, then on the Claimants' alternative case set out in paragraph 13 above:

(a)    The First and Second Defendants are in breach of the MOU in entering into sales contracts other than on terms which were back to back with the terms on which they were sold by the Claimants to them (in particular as to price).

(b)    The Claimants will, as a result, have suffered loss and damage in the amount that would have been payable by the First and Second Defendants pursuant to the profit share arrangements under the MOU had they on sold the hydrocarbons on terms which were so back to back.

(c)    The relevant amount is that referred to in paragraph 16 above (subject to the same reservation as is there made).

(d)    The Claimants claim damages in that amount.

19.    The parties to the MOU contemplated that it would operate in United States Dollars, accordingly the Claimants (as American corporations) seek payment, or alternatively damages, denominated in US Dollars.

20.    Further the Claimants **claim** interest pursuant to the Late Payment of Commercial Debts (Interest) Act 1998.

**The Contract**

21.    On 2 December 2005 the Claimants and the **Primary** Defendants entered into a contract (the "**Contract**"). The Contract superseded the MOU.

22.    Pursuant to the terms of the Contract (and in particular Clauses 1, 3, 4, 5 and 6) it was agreed that the First Claimant would (at the First Defendant's request) purchase, from time to time, hydrocarbon products for on-sale to the First Defendant, which would arrange for their importation into Guatemala, and then on-sell such cargoes to the Third Defendant either directly or via the Second Defendant.  The Third Defendant was to then on-sell the cargoes to the local Guatemalan market.

23.    Further pursuant to the terms of the Contract:

(a)    the Primary Defendants were obliged to pay, on a weekly basis, to the Claimants the declared import invoice value for the quantity of products sold from the Primary Defendants' storage tanks in the week prior to the preceding week; and

(b)    the profits from the sale of the hydrocarbons would be divided 60% to the First Claimant and 40% to the First Defendant.

24.    The said profits were to be comprised of two elements under the Contract:

(a)    The "On Shore Profits Element"; and

(b)    The "Offshore Profits Element".

25.    The relevant profits were pre-tax profits.

26.    Under the express terms of the Contract (and in particular Clause 5 thereof), the On Shore Profit Element was to be calculated on the basis of:

(a)    The value of the sales price to the Third Defendant, PLUS

(b)    The value of the sales margin made by the Third Defendant in on-selling the hydrocarbon products, MINUS

(c)    The operating expenses incurred, in relation to the transactions described in the Contract, by the **Primary** Defendants which, for the avoidance of doubt, did not include (amongst other catagories):

(i)    any taxes payable by the Primary Defendants;

(ii)    general management expenses of the Defendants; or

(iii)    depreciation charges relating to gas station assets.

27.    Under the terms of the Contract (and in particular Clause 5 thereof), the Offshore Profit Element was to be calculated on the basis of:

(a)     The value of the sale price at the declared import invoice value, MINUS

(b)     The value of the purchase price paid by the First Claimant for the hydrocarbon products, PLUS

(c)     Any profits or losses derived from related hedging, as agreed between the Claimants and the **Primary** Defendants, MINUS

(d)     Direct costs (such as freight, inspector fees, demurrage, letter of credit opening costs and finance costs) to the extent that these were not included in the calculation of the On Shore Profit Element).

28.     On a true construction of Clause 5, the On Shore Profits Element consists of the difference between the sale price of hydrocarbon product to third parties and their declared import invoice value less other operating expenses.

29.     The Contract is stated to be governed by and construed in accordance with English law without regard to its principles of conflicts of laws, and contains an exclusive submission by all the parties thereto to the jurisdiction of the English courts.

30.     On 25 May 2006 the parties to the Contract entered into an amendment thereto (the "**First Amendment**"), clarifying the performance of certain obligations, and providing that the First Claimant should have a security interest in the hydrocarbon product that remained in the **Primary** Defendants' possession. This amendment also clarified, *inter alia*, the rights and obligations of the parties in relation to certain specified cargoes.

31.     The Contract was further varied by the substitution of the Fourth Defendant in the place of the Third Defendant with effect from 6 June 2006:

(a)     by the substitution of the Fourth Defendant in place of the Third Defendant in Clause 5 (as is the Defendants' own case as set out at paragraph 17(b) of the Amended Defence, albeit by way of an alternative case to their primary case at paragraph 17(a) of the Amended Defence) and the addition of the

Fourth Defendant alongside the Primary Defendants elsewhere in the Contract; alternatively

(b)    by the substitution of the Fourth Defendant in place of the Third Defendant in Clause 5 of the Contract (as is the Defendants' own case as set out at paragraph 17(b) of the Amended Defence, albeit by way of an alternative case to their primary case at paragraph 17(a) of the Amended Defence).

32.    Accordingly as regards the period from 6 June 2006 the Contract should be so read.

33.    The agreement so to vary the Contract is to be found in the conduct of the parties including that set out at paragraph 17 of the Amended Defence and the fact that the parties thereafter proceeded on the basis that the Fourth Defendant was the entity selling to the local market and that such sales should be taken into account for the purposes of Clause 5 of the Contract.

34.    Alternatively, and as is the corollary of the Defendants' own alternative case as set out in paragraph 17(c) of the Amended Defence, the Defendants are estopped by convention from denying that such a variation occurred.

35.    An additional amendment (the **"Second Amendment"**, and together with the First Amendment the **"Amendments"**) was entered into between the parties, effective as of 22 December 2006, which further amended the financial obligations owed in respect of certain specified cargoes.

36.    The Amendments set out a trigger mechanism by which the profit sharing mechanism would be brought to an end. At this time, the obligation to make weekly repayments of the capital invested by the Claimants would be suspended, and the remaining hydrocarbon products would be paid for in lump sum tranches cumulatively amounting to US$10,000,000 plus interest over an extended period.

37.    Based on the information which has been made available to them, the amount which is payable (or which the Defendants are estopped from denying is payable) by the Defendants and due (being still unpaid) under the Contract as the Claimants' 60%

- 9 -

share of the relevant profits is US$2,885,535.  The Claimants reserve the right to amend that figure following disclosure.

38. Further or alternatively, wrongfully and in breach of the Contract the Defendants have refused to pay the said sum to the Claimants and the Claimants have thereby suffered loss and damage in the like amount.

39. Further, the sum of US$728,730 is payable under Clause D of the First Amendment as varied by Clause B of the Second Amendment and due (being still unpaid).

40. Further or alternatively, wrongfully and in breach of the Contract the Defendants have refused to pay the said sum to the Claimants and the Claimants have thereby suffered loss and damage in the like amount.

41. Further or alternatively, the Defendants have breached the Contract and in particular Clause 4 thereof in failing to make timely payments of the sums due thereunder. As a result of such breaches, the Claimants have suffered loss and damage particulars of which will be provided in due course.

42. The Contract provides that payments made thereunder shall be made in United States Dollars, the First Claimant (as an American corporation) accordingly seeks payment, alternatively damages, denominated in US Dollars.

43. Further the First Claimant claims interest pursuant to the Late Payment of Commercial Debts (Interest) Act 1998 alternatively pursuant to section 35A of the Supreme Court Act 1981, for such time and at such rate as the Court thinks fit.

**AND THE CLAIMANTS CLAIM**

(1) US$2,453,829 as set out in paragraph 16 above;

(2) US$2,885,535 as set out in paragraph 37 above;

(3) US$728,730 as set out in paragraph 39 above;

(4) Damages for breach of contract, to be assessed, but in any event not less in value than £15,000;

(5)     Interest; and

(6)     Costs.

Philip Edey Q.C.

Mark Beeley

1 May 2009

**STATEMENT OF TRUTH**

I believe that the facts stated in this Re-Amended Particulars of Claim are true.

_____

William R. Brooks
Vice Chairman and Chief Financial Officer
Speedway Motorsports, Inc.

_____

David Blihovde
Vice President – Operations
Oasis Trading Group, LLC

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Folio No.

B E T W E E N:

SPEEDWAY MOTORSPORTS, INC.

Claimant

-and-

(1)    BLUE OIL TRADING LTD

(2)    CORPORACION ARCENILLAS S.A.

(3)    ECOPETROLEOS S.A.

(4) BLUE OIL S.A.

Defendants

---

### RE-AMENDED PARTICULARS OF CLAIM
### (CPR PART 7)

---

**Vinson & Elkins R.L.L.P.**

CityPoint,
1 Ropemaker Street
London EC2Y 9UE
Tel: 020 7065 6000
Fax: 020 70656 6001

Ref: SPE516/88000/JLL/MJB

Re-Amended Defence and Counterclaim by Order of Mr Justice Cooke dated 1
May 2009.

IN THE HIGH COURT OF JUSTICE                          2007 No. 1644

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N : -


(1) SPEEDWAY MOTORSPORTS, INC.

(2) OASIS TRADING GROUP, LLC

**Claimants**

- and –

(1) BLUE OIL TRADING LTD

(2) CORPORACION ARCENILLAS S.A.

(3) ECOPETROLEOS S.A.

(4) BLUE OIL S.A.

**Defendants**

---

**FIRST TO FOURTH DEFENDANTS'
RE-AMENDED DEFENCE AND COUNTERCLAIM**

---


**DEFENCE**

1.     All references to paragraph numbers in this Re-Amended Defence and
Counterclaim are to paragraphs of the Re-Amended Particulars of Claim, save
where the context requires otherwise. References to "the Claimants" in this
Defence and Counterclaim are references to both Claimants, and references to
"the Defendants" are references to all four Defendants. The Claimants and the
Defendants are collectively referred to as "the Parties". The headings and
definitions used by the Claimants in their Re-Amended Particulars of Claim

"Maxwell Decl. Ex. B"

have been used in this Re-Amended Defence and Counterclaim, solely for the sake of convenience.

2.    Paragraph 1 is admitted, save that it is the Defendants' understanding that the First Claimant's (hereinafter "SMI") principal business is the marketing and promoting of motorsports entertainment in the United States, and that the supply of hydrocarbon products such as gasoline and diesel fuel only accounts for a very small fraction of SMI's business.

3.    Paragraph 2 is admitted. From the outset of the Parties' relationship, the Claimants represented the Second Claimant (hereinafter, "Oasis") to be "an affiliate of SMI".

4.    As for paragraphs 3 to 6:

    (a)    The registered address of the First Defendant (hereinafter "Blue Oil Trading") is Chera Chambers, Road Town, Tortola, British Virgin Islands.

    (b)    The registered address of the Second Defendant (hereinafter "Arcenillas") is 12 Avenida 16-66 Zona 10, Segundo Nivel, Guatemala C.A.

    (c)    The registered address of the Third Defendant (hereinafter "Ecopetroleos") is 12 Avenida 16-66 Zona 10, Segundo Nivel, Guatemala C.A.

    (d)    The registered address of the Fourth Defendant (hereinafter "Blue Oil SA") is 12 Avenida 16-66 Zona 10, Segundo Nivel, Guatemala C.A.

    (e)    Arcenillas is primarily engaged in the operation of an oil terminal in Guatemala and has only punctually engaged in the importation and on-sale of hydrocarbon products into Guatemala, as further pleaded in paragraph 8(b) below.

    (f)    Blue Oil SA only engaged in the wholesale and distribution of hydrocarbon products in Guatemala from 6 June 2006 onwards, as further pleaded in paragraph 8(b) below.

    (g)    Save as aforesaid, paragraphs 3 to 6 are denied.

5.   In paragraph 7:

    (a)   It is admitted that the Defendants are all part of the same group of companies;

    (b)   It is denied that "each [of the Defendants] is controlled by the same individuals, Matias Rojas and Max Beckett", and it is denied that the Defendants' internal corporate structure has any relevance to this claim;

    (c)   The last sentence is noted;

    (d)   Save as aforesaid paragraph 7 is denied.

**Claim under the Memorandum of Understanding**

6.   The first sentence of paragraph 8 is admitted. The remainder of paragraph 8 is not admitted. The Defendants will rely on the MOU at the trial of this action for its full terms, true meaning and effect.

7.   In paragraph 9(a):

    (a)   The relevance of the averment that *"pursuant to the terms of the MOU it was agreed that: (a) The Claimants would finance the purchase of hydrocarbon products ..."* is not understood, and that averment is not admitted as the point remains unclear in the light of paragraph 5 of the Claimants' Response to the Defendants' Request for Information made on 15 May 2009. If and insofar as it is the Claimants' contention that the MOU was no more than an agreement whereby the Claimants were to provide financing to Blue Oil Trading:

        (1)   The relevance of that contention is not understood; and

        (2)   That contention is denied.

    (b)   It is admitted that the MOU contemplated a sales structure whereby the Claimants (US companies) would purchase hydrocarbon products on the international market, sell them on to Blue Oil Trading (a BVI company), who would in turn sell them to a Guatemalan third party (Alka Wenker). Accordingly at the time of the conclusion of the MOU in May 2005, all the profits to be made thereunder were to be made

"offshore" (i.e. not within Guatemala), and not subject in any way to Guatemalan taxes.

(c)     The remainder of paragraph 9(a) is not admitted. The Defendants will rely on the MOU at the trial of this action for its full terms, true meaning and effect.

8.     In paragraph 9(b):

(a)     It is denied that the profit split was to be made "pre-tax". As averred in paragraph 9 below, and as admitted by the Claimants in paragraph 10 of the Re-Amended Particulars of Claim, the MOU was varied within weeks of its signature so that (in particular and without prejudice to the detailed allegations set out in paragraph 9 below) the Parties were forced (in addition to the offshore operations noted in paragraph 7(b) above) to operate within Guatemala (i.e. "onshore") in order to market the hydrocarbon products to the local market. As a result, while the offshore profits made were to be split free of tax (no tax being in fact payable thereon), the onshore profits made were to be split after payment of the Guatemalan taxes which the said operations within Guatemala necessarily attracted.

(b)     It is denied (if it be so alleged) that the costs to be deducted from the revenues generated under the MOU are limited to those expressly listed in Recital (J) of the MOU. In particular, and without prejudice to the generality of the foregoing, the costs to be deducted from the onshore part of the operations included (by definition) costs of carrying on the business within Guatemala which the Parties had not originally intended to bear.

(c)     The remainder of paragraph 9(b) is not admitted. The Defendants will rely on the MOU at the trial of this action for its full terms, true meaning and effect.

9.     Paragraph 10 is admitted and averred. While the MOU originally contemplated that hydrocarbon products would be sold by SMI or Oasis to Blue Oil Trading and then sold on by Blue Oil Trading to a local oil storage and distribution network (Alka Wenker):

(a)  As the Claimants are well aware, sales could in fact only be made to Alka Wenker for a very limited period of time (up to and including 29 June 2005) for the following reasons:

(1)  The underlying assumption for the Parties' business venture was that all hydrocarbon products imported into Guatemala by Blue Oil Trading would be held in a duty free zone for combustibles, and that Guatemalan tax would only be payable on such products upon on-sale to the local market.

(2)  On 24 May 2005, only 5 days prior to the arrival of the first shipment of hydrocarbon product into Guatemala under the MOU, Blue Oil Trading was informed by the General Manager of Alka Wenker (Mr Morales) that the Guatemalan Government was abolishing duty free zones for combustibles with effect from 1 June 2005. The Claimants were immediately apprised of this development, and copies of the relevant legislation were provided to the Claimants by e-mail on 31 May 2005.

(3)  The said development meant that all hydrocarbon products would be considered imported into Guatemala from their date of discharge, and all Guatemalan taxes paid at that time. Alka Wenker informed Blue Oil Trading that it had insufficient cash to absorb the resulting adverse cash flow impact. Following discussions with both Alka Wenker and the Claimants, a solution was found whereby (a) Alka Wenker's storage network was taken over by Arcenillas, and (b) Alka Wenker's distribution network was gradually taken over first by Ecopetroleos and then by Blue Oil SA. It subsequently emerged that Alka Wenker's swift exit from the Guatemalan market was in fact primarily caused by differences between Alka Wenker and its principals and the Guatemalan tax authorities.

(4)  As a result, the structure for sales of products during the Parties' relationship underwent several changes, both during the period covered by the MOU and during the period covered by the Contract:

       (1)    From 5 June 2005 to 29 June 2005, SMI sold products to Arcenillas which sold them to Alka Wenker which sold them to the local Guatemalan market;

       (2)    From 30 June 2005 to 13 November 2005, SMI sold products to Arcenillas which sold them to Ecopetroleos which sold them to the local Guatemalan market;

       (3)    From 14 November 2005 to 21 December 2005, SMI sold products to Blue Oil Trading which sold them to Arcenillas which sold them to Ecopetroleos which sold them to the local Guatemalan market;

       (4)    From 22 December 2005 to 5 June 2006, SMI sold products to Blue Oil Trading which sold them to Ecopetroleos which sold them to the local Guatemalan market;

       (5)    From 6 June 2006 to 21 September 2006, SMI sold products to Blue Oil Trading which sold them to Blue Oil SA which sold them to the local Guatemalan market.

(b)    The Claimants were at all times made aware of the aforesaid changes in sales structure, in particular through the frequent contemporaneous telephone and e-mail exchanges between the Parties, and through the regular (weekly or bi-weekly) reports sent by the Defendants to the Claimants throughout the Parties' relationship, which detailed (*inter alia*) daily sales of each product, the counterparty selling each product, the price at which the product was sold and the monies received for each product. In particular, without prejudice to the generality of the foregoing and specifically with respect to the decision to stop sales through Alka Wenker, the Defendants will rely at the trial of this claim on the Powerpoint presentation made by Messrs Beckett and Rojas of the Defendants to Messrs Brooks and Blihovde of the Defendants on or about 30 June 2005, which explained both the required changes in sales structure and the underlying reasons for those changes. The Defendants (through Messrs Brooks and Blihovde) approved these changes at the said meeting.

10.     Paragraph 11(a) is admitted, save that:

    (a)     The effect of the agreed changes in the sales chain set out in paragraph 9 above was that the profits to be shared between the Parties during the period of the MOU included not only the offshore profits originally contemplated, but also any sales profits made by Ecopetroleos and Arcenillas on their on-sales of the hydrocarbon products onshore during the periods when they were involved in the sales chain.

    (b)     The effect of the agreed changes was that the said onshore sales profits were to be calculated net of Guatemalan taxes and of related costs.

    (c)     As a matter of fact, and as the Claimants are aware, the said onshore sales profits (calculated on a post-tax and net-of-costs basis) have at all times been included in the Defendants' profit split calculations.

11.     Paragraph 11(b) is denied, given the Defendants' case on the effect of the express agreement of the Parties set out in paragraph 10 above. If, which is denied, a term is to be implied into the MOU as contended, that term is to the effect that the profits "to be taken into account" were onshore profits net of Guatemalan taxes and of related costs. Further or alternatively, if and insofar as the express agreement of the Parties did not capture this aspect of their agreement, a term is to be implied into the MOU to that effect.

12.     Paragraph 12 is denied, given the Defendants' case on the effect of the express agreement of the Parties set out in paragraph 10 above. If, which is denied, an estoppel by convention arises as contended, the common assumption of the Parties on which they proceeded was that the profits to be "included" were onshore profits net of Guatemalan taxes and of related costs. Further or alternatively, if and insofar as the express agreement of the Parties did not capture this aspect of their agreement, an estoppel by convention arises to that effect.

13.     In the premises, paragraph 13 is denied.

4A_3216564_2                7

14.     Paragraphs 14 and 15 are denied. Without prejudice to the generality of that denial:

(a)     The MOU covered the Parties' relationship from the date of its signature (16 May 2005) to the date when it was superseded by the Contract as averred in paragraph 21 (2 December 2005). The Parties reconciled and agreed the profit and loss figures for that period in the course of the first six months of 2006, and the Claimants confirmed that a final agreement had been reached in that respect in an e-mail from Mr Blihovde of Oasis to Mr Beckett of the Defendants of 18 July 2006, and in a fax from Mr Brooks of SMI to Messrs Rojas and Beckett of the Defendants of 24 July 2006.

(b)     On 5 April 2007, the Defendants sent to the Claimants a final statement of account for the totality of the Parties' trading relationship (under the MOU and under the Contract), incorporating *inter alia* what it understood to be the agreed figure for the period ending 31 December 2005. The relevant calculation shows a sum of US$ 365,801.66 as owing from Blue Oil Trading to the Claimants. On 14 May 2007, the Claimants responded accepting that that figure was correct, save for an increase of US$ 70,574.92 in the offshore profit in the Defendants' favour and an amount of retention tax on dividends which the Defendants calculated as being of US$ 179,319 in their favour.

(c)     It is averred that the correct sum owed by Blue Oil Trading to the Claimants for the year 2005 is in fact US$ 337,571.69 (US$ 365,801.66, as agreed in 2006 less Blue Oil Trading's 40% share of the US$70,574.92 increase in offshore profit) as calculated by the Defendants in their letter of 5 April 2007, and not the greater figure (US$ 445,163) calculated by the Claimants in their letter of 14 May 2007.

(d)     As for payment of the sum owed ("the 2005 Reconciled Figure"):

(1)     Given the fact that the Parties' relationship was now continuing under the Contract, the Parties agreed that the 2005 Reconciled Figure would not be paid immediately, but would be taken into

account when reconciling the Parties' final account under the Contract. This is what has in fact happened.

(2)  Alternatively, the Claimants have at all times until service of the Particulars of Claim unequivocally represented to Blue Oil Trading that the 2005 Reconciled Figure need not be paid immediately, and that it would be taken into account when reconciling the Parties' final account under the Contract, Blue Oil Trading has acted on those representations (in that it would otherwise have effected payment), and the Claimants are estopped from contending that payment became due at any time prior to service of the Particulars of Claim and/or that Blue Oil Trading is in breach of the MOU in that respect.

(3)  Further or alternatively, Blue Oil Trading is entitled to set-off against the 2005 Reconciled Figure the sums owed to it under the Contract as further particularised in the Counterclaim below.

15.  Paragraph 16 is denied. As pleaded in paragraph 14 above, the sum payable by Blue Oil Trading to the Claimants under the MOU is the 2005 Reconciled Figure of US$ 337,571.69.

16.  As for the last sentence of paragraph 16, and/or if and insofar as the Claimants seek to contend that "the information which has been made available to them" referred to in the first sentence of paragraph 16 was in any way insufficient to allow them to quantify their claims, it is denied that the Claimants were not provided with information sufficient fully to quantify their claims during the course of the MOU and/or that disclosure can have an impact on the quantification of the Claimants' claims under the MOU. Without prejudice to the generality of those denials, the Claimants have at all material times had all the information required to quantify their contractual entitlement to their share of the profits both under the MOU and under the Contract, and the Claimants have in fact quantified their contractual entitlement under the MOU as pleaded in paragraph 14 above. Without prejudice to the generality of the foregoing, the Defendants will rely *inter alia* on the following in respect of their

averment that the Claimants have at all material times had all the information required to quantify their contractual entitlement to their share of the profits both under the MOU and under the Contract:

(a)     As already pleaded in paragraph 9(b) above, the Claimants were provided throughout the Parties' relationship with regular (weekly or bi-weekly) contemporaneous reports, which detailed (*inter alia*) daily sales of each product, the counterparty selling each product, the price at which the product was sold and the monies received for each product. The Claimants also had full access at all material times to direct email reports for the level of inventories provided by an independent inspector, Intertek Testing Services ("ITS"), and from January 2006 to an online reporting system provided by ITS.

(b)     The Claimants were provided with quarterly audited statements for Arcenillas and for Ecopetroleos. These audited statements were prepared by independent and reputed auditors agreed by both Parties (Deloitte Guatemala, Deloitte being at the time SMI's preferred auditors, whom they used in the United States), and were sent to the Claimants as and when they were ready.

(c)     The Claimants had complete control over the Guatemala bank account of Blue Oil Trading used for the purpose of transactions under the Contract from January 2006 onwards, with the totality of all sums on that account being regularly transferred to SMI and being taken into account in the calculation of the "Offshore" portion of the agreements controlled by the Claimants.

(d)     The Claimants in fact used the above financial information to make their own calculations of their share of the profits both under the MOU and under the Contract. With respect to their share of profits under the MOU, the Claimants never complained that the said information was in any way insufficient, inadequate or incomplete, and the relevant profit and loss figures were in fact reconciled and agreed as set out in paragraph 14 above. With respect to their share of profits under the Contract, the Claimants never complained that the said information was in any way insufficient, inadequate or incomplete at any time

during the Parties' trading relationship. In particular but without prejudice to the generality of the foregoing:

(1)     On 27 March 2007 (the Parties' trading relationship having expired on or about 21 September 2006), the Claimants sent to the Defendants their calculations of their share of profits under the Contract. The said calculations were based (for the On-shore profits portion) on the financial information provided by the Defendants. The Claimants' letter of 27 March 2007 does not make any criticism (express or implied) of that information, does not suggest that the said information may have been in any way insufficient, inadequate or incomplete, and does not contain any request for any further information or reservation in that respect.

(2)     The Defendants responded with their own calculations on 5 April 2007, providing further documents from Deloitte. The Claimants responded with revised calculations on 14 May 2007 which were further revised on 11 June 2007. Again, the Claimants' letters of 14 May 2007 and 11 June 2007 do not make any criticism (express or implied) of the financial information provided by the Defendants, do not suggest that the said information may have been in any way insufficient, inadequate or incomplete, and do not contain any request for any further information or reservation in that respect.

(3)     The Claimants first threatened "a full investigation into the operations under the Agreement" in a letter to the Defendants of 18 June 2007, without explaining in any way what that "full investigation" was meant to entail, or what aspect of the financial information provided by the Defendants they were thereby seeking to question. No formal demand was then made for any further information until 6 September 2007, when such a demand was first made by the Claimants' solicitors.

(e)     In paragraphs 7(b) and 22(b) of their Response to the Defendants' Part 18 Request made on 14 February 2008 (which response was filed on 3 March 2008), the Claimants have pleaded that "in producing [the]

calculations [referred to in paragraph 16(d)(1) above], [they] relied on the Audited Financial Statements for year ending 31 December 2005, and for the nine months ended 30 September 2006 for each of [Arcenillas, Ecopetroleos and Blue Oil SA]". An independent review of the "Onshore" portion of the agreements requested by the Claimants and jointly commissioned by the Claimants and the Defendants has confirmed (in a Report made by independent accountants Littlejohn on 17 October 2008) that the aforesaid audited statements are accurate and reliable, and that all alleged concerns raised by the Claimants in their respect are unfounded.

(f)     On 1 August 2006, as the Parties' trading relationship was nearing its end, the Claimants sent a private consultant to Guatemala to check the operational procedures, records and inventories which the Defendants were reporting to the Claimants. The said consultant was given complete access to all of the Defendants' books and records, and chose for himself what information he wished to access. It was clear to the Defendants from the consultant's behaviour and comments during his visit that he was satisfied that the information provided by the Defendants had been accurate and complete. Nor did the Claimants in any way question the accuracy and completeness of the said information following the consultant's visit. In particular, as pleaded in paragraph 16(d) above, no complaint was made by the Claimants (whether in writing or otherwise) as to the completeness or accuracy of the financial information supplied by the Defendants until June 2007, nearly a year later, and some nine months after the end of the Parties' trading relationship.

17.     In the premises, paragraphs 17 and 18 are denied.

18.     Paragraphs 19 and 20 are noted. It is admitted and averred that the unit of accounting between the Parties has been and should be United States Dollars. It is denied that the Claimants are entitled to payment, damages or interest under the MOU whether as alleged or at all.

19.     Further and in any event, the MOU provided that "if any dispute arises under or in connection with this agreement which both parties fail to settle by negotiation, the party seeking to make the claim shall commence legal proceedings within one year from the date on which the events giving rise to the claim occurred failing which the claim shall be deemed waived and absolutely barred without recourse to litigation or arbitration". The events giving rise to the Claimants' present claim under the MOU occurred in 2005 more than two years before the Claimants issued proceedings. In the premises, the said claim has been waived by the Claimants and is absolutely barred under the terms of the MOU.

**Claim under the Contract**

20.     Paragraph 21 is admitted.

21.     Paragraphs 22 to 24 are not admitted. The Defendants will rely on the Contract at the trial of this action for its full terms, true meaning and effect.

22.     Paragraph 25 is denied. While the Offshore Profits made outside Guatemala can be characterised as "pre-tax profits" (no tax being in fact payable on such Offshore Profits), the Onshore Profits made within Guatemala were to be split after payment of the relevant Guatemalan taxes.

23.     Save that paragraph 26(c) is specifically denied, paragraphs 26 and 27 are not admitted. The Defendants will rely on the Contract at the trial of this action for its full terms, true meaning and effect.

24.     Paragraph 28 is denied, save that:

    (a)     During the period of the Contract, the hydrocarbon products were imported first by Arcenillas (from 2 December 2005 to 21 December 2005) and then by Ecopetroleos (from 22 December 2005 to the end of the Contract) into Guatemala at the declared import invoice value of the goods, and resold first by the Ecopetroleos (from 2 December 2005

to 5 June 2006) and then by Blue Oil SA (from 6 June 2006 to the end of the Contract) to third parties on the local Guatemalan market.

(b)    Accordingly, it is admitted that a convenient way to calculate the gross sales margin made onshore is to deduct the declared import invoice value (at which the hydrocarbon products were imported into Guatemala) from their ultimate sale price to third parties.

(c)    The Onshore Profits Element (defined at paragraph 24ff of the Re-Amended Particulars of Claim) is then obtained by deducting from that gross onshore sales margin not only operating expenses, but also the Guatemalan taxes arising from the onshore operations.

25.    Paragraph 29 is not admitted. The Defendants will rely on the Contract at the trial of this action for its full terms, true meaning and effect.

26.    In paragraph 30, it is admitted that the First Amendment was concluded on or about 26 May 2006. The remainder of paragraph 30 is not admitted. The Defendants will rely on the First Amendment at the trial of this action for its full terms, true meaning and effect.

27.    It is admitted that the Contract was varied by the substitution of Blue Oil SA in the place of Ecopetroleos with effect from 6 June 2006, and that the Contract is to be so read for the period from 6 June 2006. Save as aforesaid paragraphs 31 to 34 are denied.

28.    In paragraph 35, it is admitted that the Second Amendment was entered into between the Parties, and was effective as from 22 December 2006. The remainder of paragraph 35 is not admitted. The Defendants will rely on the Second Amendment at the trial of this action for its full terms, true meaning and effect.

29.    Paragraphs 36, 39 and 40 are denied. Without prejudice to the generality of that denial:

(a)    On a true construction of the Contract and of the First and Second Amendments, the sum repayable by the Defendants to the Claimants

4A_3216564_2            14

under Clause D of the First Amendment and under Clause B of the Second Amendment was not US$ 10 million, but the actual value of the hydrocarbon products taken over by the Defendants on the date of termination of the Contract provided for under Clause E of the First Amendment. That date was 21 September 2006, and that value was US$ 8,115,172.78 as set out in the Inventory Value Loss Scenario on the attached Schedule A. As further explained in the said Schedule, the disparity in value stems from the fact that, under Clause E of the First Amendment, the Contract was to terminate "at the time the declared invoice value of the products" reached US$ 10 million. The declared invoice value of the products was their value as of the date when the products arrived in Guatemala (i.e. 9 July 2006 for gasoline fuel and 18 July 2006 for diesel fuel). By 21 September 2006, when products in the Defendants' storage tanks had decreased to a level where their declared invoice value reached US$10 million, the market had fallen so that the actual market value of those remaining product was only of US$ 8,115,172.78.

(b)   Alternatively, if (which is denied) the construction pleaded in paragraph 29(a) above is incorrect, on a true construction of the Contract and of the First and Second Amendments, at termination of the Contract (on 21 September 2006), the Defendants took over not only the hydrocarbon products remaining in their storage tanks as of that date, but also the proceeds from the hedging contracts entered into as hedges for those products, with the rise in value of those hedging contracts having largely matched the decrease in value of the related products. In the premises, the said hedging gains are to be excluded from the "division of profits" contemplated in Clause E of the First Amendment.

(c)   In the further alternative, if (which is denied) the constructions pleaded in paragraph 29(a) and (b) above are incorrect, a term is to be implied into the Contract to the effect that at termination of the Contract, the Defendants would take over not only the hydrocarbon products remaining in their storage tanks as of that date, but also the proceeds from the hedging contracts entered into as hedges for those products,

and that the said hedging gains are to be excluded from the "division of profits" contemplated in Clause E of the First Amendment.

30.    Paragraphs 37 and 38 are denied. Without prejudice to the generality of that denial: '

(a)    As for the last sentence of paragraph 37, and/or if and insofar as the Claimants seek to contend that "the information which has been made available to them" referred to in the first sentence of paragraph 37 was in any way insufficient to allow them to quantify their claims, it is denied that the Claimants were not provided with information sufficient fully to quantify their claims during the course of the Contract and/or that disclosure can have an impact on the quantification of the Claimants' claims under the Contract. Paragraph 16 above is repeated.

(b)    On the Claimants' own case, method of calculation and figures, and for the reasons set out in Requests 9 and 10 of the Defendants' Request for Further Information dated 15 May 2009, the true quantum of the Claimants' claim under the Contract is not US$2,885,535 but US$550,935 (the alleged apparent explanations to the contrary contained in paragraphs 16 to 21 of the Claimants' Response to the Defendants' Request for Information of 15 May 2009 not being understood or admitted).

(c)    No payment can occur until such time as the Parties have reconciled their final accounts under the Contract. As pleaded in paragraph 16 above, this process of reconciliation was initiated in 2007, but has now stalled in the light of the Claimants' new and unfounded assertions (contained in their Amended Particulars of Claim and in their Re-Amended Particulars of Claim) that they did not have sufficient financial information to complete that process. The Defendants have at all times been ready and willing to complete that process, and (notwithstanding the matters pleaded in paragraph 16 above) have offered (*inter alia* in letters from the Defendants' solicitors to the Claimants' solicitors of 14 September 2007 and 5 November 2007) to provide the Claimants with such additional financial information as

they genuinely require for that purpose. As noted in paragraph 16(e) above, an independent review of the "Onshore" portion of the agreements requested by the Claimants and jointly commissioned by the Claimants and the Defendants has also taken place in September – October 2008.

(d)     As explained in more detail in the Defendants' counterclaim below, the correct reconciliation of accounts in fact shows a balance outstanding to the Defendants of US$ 3,901,677 and no sum accordingly falls to be paid to SMI whether as alleged in paragraph 37 or at all.

31.     Paragraph 41 is denied. The Defendants reserve the right to plead further to this allegation if and when it is properly particularised.

32.     Paragraphs 42 and 43 are noted. It is admitted and averred that the unit of accounting between the Parties has been and should be United States Dollars. It is denied that the Claimants are entitled to payment, damages or interest under the Contract whether as alleged or at all.

33.     If, contrary to their Re-Amended Defence herein, the Defendants are found liable to the Claimants for any amount, they seek to set-off against the said amount the sums counterclaimed below, in diminution or extinction thereof.

## COUNTERCLAIM

34.     Paragraphs 1 to 33 of the Re-Amended Defence are repeated.

35.     The correct reconciliation figures are as follows:

(a)     Taking into account the profits of Blue Oil SA the correct final reconciliation of accounts between the Claimants and the Defendants shows a balance in favour of the Defendants in the sum of US$ 4,622,983 as the consolidation of Blue Oil SA and of Ecopetroleos' results as of the end of September 2006 would subject the results to Guatemalan taxes that would have otherwise been avoided. The

relevant calculation is attached in Scenario 2 on the attached Schedule A.

(b) if (which is denied) the sum repayable by the Defendants to the Claimants under Clause D of the First Amendment and under Clause B of the Second Amendment was US$ 10 million (and the profits made on the relevant hedging contracts fall to be included in the division of profits between the Parties contrary to the Defendants' alternative case pleaded in paragraphs 29(b) and 29(c) above), the sum pleaded in paragraph 35(a) falls to be reduced by US$ 1,884,827. The relevant calculation is pleaded in paragraph 29(a) above and in Scenario 3 on the attached Schedule A there referred to.

(c) if (which is denied) the sum repayable by the Defendants to the Claimants under Clause D of the First Amendment and under Clause B of the Second Amendment was US$ 10 million, but the profits made on the relevant hedging contracts are to be excluded from the division of profits between the Parties as pleaded in paragraphs 29(b) and 29(c) above, the sum pleaded in paragraph 35(a) above falls to be reduced by US$ 1,034,327. The relevant calculation is set out in Scenario 4 on the attached Schedule A.

36. In the further alternative, the Defendants reserve their rights to revise the above accounting figures once the Claimants have finally pleaded their case on this aspect of the case.

37. In the premises, the sum of US$ 4,622,982.57, alternatively that sum increased or reduced by any applicable amount quantified in paragraph 35 above, alternatively such sum as the Court may determine following completion of the reconciliation of accounts between the Parties, (hereinafter, "the Sum Owed") is due and payable by the Claimants to the Defendants.

38. In breach of the MOU and/or of the Contract, the Claimants have failed to pay to the Defendants the Sum Owed or any part thereof, and this has caused the Defendants loss and damage in the sum of the Sum Owed.

39. Further the Defendants claim interest pursuant to section 35A of the Supreme Court Act 1981 and/or pursuant to the Late Payment of Commercial Debts (Interest) Act 1998, for such time and at such rates as the Court thinks fit.


AND THE DEFENDANTS CLAIM:-

(1)    The Sum Owed

(2)    Alternatively, damages

(3)    Interest

(4)    Such further or other relief as the Court thinks fit




                                        JOE SMOUHA QC
                                        SALIM MOOLLAN
                                        26 May 2009


Statement of Truth

The Defendants/Counterclaimants believe that the facts and matters set out in this Amended Defence and Counterclaim served on the Claimants on 26 May 2009 are true.

I am duly authorised by the Defendants to make this statement.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~          26.05.09

Anna Lucy Maxwell                        Date

**Bond Pearce LLP, Solicitors for the Defendants/ Counterclaimants**


**Served this 26th day of May 2009**

SCHEDULE A

| DATA FOR INVENTORY VALUE LOSS | | |
|---|---|---|
| LOSS OF INVENTORY VALUE | -1,884,827.22 | |
| HEDGE PROFIT | 1,417,500.00 | 567000 |
| DIFFERENCE BETWEEN LOSS OF INVENTORY VALUE AND HEDGING PROFITS | -467,327.22 | -3,034,327.22 |

DATA FOR SCENARIOS 1 TO 4

| | | BOT 40% SHARE | SMI 60% SHARE |
|---|---|---|---|
| DEDUCTION FROM JUNE 17 2007 LOAN PAYMENT | 728,493.59 | | |
| MONEY OWED BY BOT TO SMI FOR 2005 SETTLEMENT | 565,801.65 | | |
| TERMINAL LIABILITY IN GUATEMALA | -800,000.00 | -320,000.00 | -480,000.00 |
| 2006 OFFSHORE PROFIT PRESENTED AUGUST 24TH 2007 | 641,543.47 | 256,617.39 | 384,926.08 |
| 2005 PROFIT ADJUSTMENT AS PER NUMBERS PRESENTED JUNE 11 2007 | -31,042.98 | -12,417.19 | -18,625.79 |
| 2005 ADJUSTED OFFSHORE PROFIT WITHOUT HEDGE PROCEEDS | -806,999.51 | -322,799.80 | -484,199.71 |
| 2006 ECOPETROLEOS PROFIT | 406,265.00 | | |
| 2006 ECOPETROLEOS PROFIT WITH HETAP RESULTING FROM CONSOLIDATION WITH ROSA | -893,759.65 | | |
| 2006 ROSA PROFIT (LOSS) | 97,848.32 | | |
| 2006 BLUE OIL TRADING'S OPERATIONAL EXPENSES FOR GUATEMALA BUSINESS | -1,855,374.00 | -758,149.60 | -1,137,224.40 |
| 2006 ANCERILLAS EXPENSES | -2,493,142.00 | | |

INVENTORY VALUE LOSS SCENARIO

A--DEBT FOR INVENTORY IS REDUCED BY THE DROP IN THE VALUE OF THE INVENTORY BETWEEN THE TIME IT WAS DECLARED AND THE TIME IT WAS TRANSFERRED TO BOT

| VALUE OF LOAN AT TIME OF DISCHARGE | 10,000,000.00 |
|---|---|
| LOSS OF VALUE OF INVENTORY BY THE TIME LOAN WAS EFFECTED | -1,884,827.22 |
| LOAN VALUE ADJUSTED FOR LOSS OF VALUE OF INVENTORY | 8,115,172.78 |

B--DEBT FOR INVENTORY IS KEPT AT 10 MILLION, BUT HEDGE PROFIT IS TRANSFERRED AS A CREDIT TO BOT

| VALUE OF LOAN AT TIME OF DISCHARGE | 10,000,000.00 |
|---|---|
| PROFITS FROM HEDGES TAKEN TO PROTECT INVENTORY | -1,417,500.00 |
| LOAN VALUE ADJUSTED FOR HEDGE PROFITS | 8,582,500.00 |

SCHEDULE A

**SCENARIO 1**

2006 ECOPETROLEOS PROFIT - BLUE OIL TRADING'S OPERATIONAL EXPENSES - ARCENILLAS' EXPENSES - INVENTORY LOSS

2006 ONSHORE PROFIT CALC

| | |
|---|---:|
| 2006 ECOPETROLEOS PROFIT | 406,265.00 |
| 2006 BLUE OIL TRADING'S OPERATIONAL EXPENSES FOR GUATEMALA BUSINESS | -1,895,374.00 |
| 2006 ARCENILLAS EXPENSES | -2,489,142.00 |
| **2006 ONSHORE RESULTS AS PER CONTRACT** | **-3,978,251.00** |

RESULTING SUMMARY CALCULATION OF MONEY OWED BY SMI TO BLUE OIL TRADING

| | |
|---|---:|
| SMI'S 60% SHARE OF 2006 ONSHORE RESULTS | -2,386,950.60 |
| BOTT'S 40% SHARE OF 2006 OFFSHORE RESULTS PRESENTED AUG 24TH 2007 | -256,617.39 |
| 2006 PROFIT ADJUSTMENT AS PER NUMBERS PRESENTED JUNE 11 2007 | 12,417.19 |
| LOSS OF INVENTORY VALUE | -1,084,827.22 |
| SMI'S SHARE OF TERMINAL LIABILITY | -480,000.00 |
| MONEY OWED BY BOTT TO SMI FOR 2005 SETTLEMENT | 365,801.66 |
| MONEY OWED BY BOTT TO SMI FOR DEDUCTION FROM JUNE 15 '07 LOAN PAYMENT | 728,499.59 |
| **TOTAL MONEY OWED BY SMI TO BLUE OIL TRADING** | **-3,501,677** |

**SCENARIO 2**

2006 BOSA PROFIT + 2006 ECOPETROLEOS PROFIT - BLUE OIL TRADING'S OPERATIONAL EXPENSES - ARCENILLAS' EXPENSES + INVENTORY LOSS

2006 ONSHORE PROFIT CALC

| | |
|---|---:|
| 2006 BOSA PROFIT (LOSS) | 97,848.32 |
| 2006 ECOPETROLEOS PROFIT WITH IETAP RESULTING FROM CONSOLIDATION WITH BOSA | -893,759.65 |
| 2006 BLUE OIL TRADING'S OPERATIONAL EXPENSES FOR GUATEMALA BUSINESS | -1,895,374.00 |
| 2006 ARCENILLAS EXPENSES | -2,489,142.00 |
| **2006 ONSHORE RESULTS AS PER CONTRACT** | **-5,180,427.33** |

RESULTING SUMMARY CALCULATION OF MONEY OWED BY SMI TO BLUE OIL TRADING

| | |
|---|---:|
| SMI'S 60% SHARE OF 2006 ONSHORE RESULTS | -3,108,256.40 |
| BOTT'S 40% SHARE OF 2006 OFFSHORE RESULTS | -256,617.39 |
| 2006 PROFIT ADJUSTMENT AS PER NUMBERS PRESENTED JUNE 11 2007 | 12,417.19 |
| LOSS OF INVENTORY VALUE | -1,084,827.22 |
| SMI'S SHARE OF TERMINAL LIABILITY | -480,000.00 |
| MONEY OWED BY BOTT TO SMI FOR 2005 SETTLEMENT | 365,801.66 |
| MONEY OWED BY BOTT TO SMI FOR DEDUCTION FROM JUNE 15 '07 LOAN PAYMENT | 728,499.59 |
| **TOTAL MONEY OWED BY SMI TO BLUE OIL TRADING** | **-4,632,983** |

721,306

SCHEDULE A

**SCENARIO 3**

2006 ECOPETROL/EOS PROFIT - BLUE OIL TRADING'S OPERATIONAL EXPENSES - ARCENILLAS EXPENSES
(NO LOSS OF INVENTORY VALUE)
2006 ONSHORE PROFIT CALC

| | |
|---|---|
| 2006 ECOPETROL/EOS PROFIT | 406,265.00 |
| 2006 BLUE OIL TRADING'S OPERATIONAL EXPENDS FOR GUATEMALA BUSINESS | -1,895,374.00 |
| 2006 ARCENILLAS EXPENSES | -2,489,142.00 |
| **2006 ONSHORE RESULTS AS PER CONTRACT** | **-3,978,251.00** |

RESULTING SUMMARY CALCULATION OF MONEY OWED BY SMI TO BLUE OIL TRADING

| | |
|---|---|
| SMI'S 60% SHARE OF 2006 ONSHORE RESULTS | -2,386,550.60 |
| BOT'S 40% SHARE OF 2006 OFFSHORE RESULTS | -256,617.39 |
| 2006 PROFIT ADJUSTMENT AS PER NUMBERS PRESENTED JUNE 11 2007 | 12,417.19 |
| LOSS OF INVENTORY VALUE | - |
| SMI'S SHARE OF TERMINAL LIABILITY | -480,000.00 |
| MONEY OWED BY BOT TO SMI FOR 2005 SETTLEMENT | 365,801.66 |
| MONEY OWED BY BOT TO SMI FOR DEDUCTION FROM JUNE 15 '07 LOAN PAYMENT | 728,499.59 |
| **TOTAL MONEY OWED BY SMI TO BLUE OIL TRADING** | **-2,016,850** |

−1,884,827

**SCENARIO 4**

2006 ECOPETROL/EOS PROFIT - BLUE OIL TRADING'S OPERATIONAL EXPENSES - ARCENILLAS' EXPENSES + HEDGE PROFITS
(NO LOSS OF INVENTORY VALUE)
2006 ONSHORE PROFIT CALC

| | |
|---|---|
| 2006 ECOPETROL/EOS PROFIT | 406,265.00 |
| 2006 BLUE OIL TRADING'S OPERATIONAL EXPENDS FOR GUATEMALA BUSINESS | -1,895,374.00 |
| 2006 ARCENILLAS EXPENSES | -2,489,142.00 |
| **2006 ONSHORE RESULTS AS PER CONTRACT** | **-3,978,251.00** |

RESULTING SUMMARY CALCULATION OF MONEY OWED BY SMI TO BLUE OIL TRADING

| | |
|---|---|
| SMI'S 60% SHARE OF 2006 ONSHORE RESULTS | -2,386,550.60 |
| BOT'S 40% SHARE OF 2006 OFFSHORE RESULTS | 322,799.80 |
| LOSS OF INVENTORY VALUE | - |
| HEDGE PROFIT | -1,417,500.00 |
| SMI'S SHARE OF TERMINAL LIABILITY | -480,000.00 |
| MONEY OWED BY BOT TO SMI FOR 2005 SETTLEMENT | 365,801.66 |
| MONEY OWED BY BOT TO SMI FOR DEDUCTION FROM JUNE 15 '07 LOAN PAYMENT | 728,499.59 |
| **TOTAL MONEY OWED BY SMI TO BLUE OIL TRADING** | **-2,867,350** |

1,634,327.22

2007 No. 1644

IN THE HIGH COURT OF
JUSTICE

QUEEN'S BENCH DIVISION

COMMERCIAL COURT

B E T W E E N : -

(1) SPEEDWAY
MOTORSPORTS, INC.

(2) OASIS TRADING GROUP,
LLC

<u>Claimants</u>

- and –

(1) BLUE OIL TRADING LTD

(2) CORPORACION
ARCENILLAS S.A.

(3) ECOPETROLEOS S.A.

(4) BLUE OIL S.A.
<u>Defendants</u>

---

**FIRST TO FOURTH
DEFENDANTS'
RE-AMENDED DEFENCE AND
COUNTERCLAIM**

---

Bond Pearce LLP (Ref:

AM9)

3 Temple Quay

Temple Back East

Bristol BS1 6DZ

20

Amended Reply and Defence to Counterclaim by Order of Mr. Justice Cooke dated 1
May 2009

Folio No. 2007/1644

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

B E T W E E N:

(1)   SPEEDWAY MOTORSPORTS, INC.

(2)   OASIS TRADING GROUP, LLC

<u>Claimants</u>

-and-

(1)   BLUE OIL TRADING LTD

(2)   CORPORACION ARCENILLAS S.A.

(3)   ECOPETROLEOS S.A.

(4)   BLUE OIL S.A.

<u>Defendants</u>

---

## FIRST AND SECOND CLAIMANTS'
## AMENDED REPLY AND DEFENCE TO COUNTERCLAIM

---

1.     All references to paragraph numbers in this Reply and Defence to Counterclaim are
to paragraphs of the Re-Amended Defence and Counterclaim, save where the
context requires otherwise.  The headings and definitions used in both the Re-
Amended Particulars of Claim and the Re-Amended Defence and Counterclaim are
adopted herein for convenience.

2.     Save in so far as it consists of admissions and save as expressly stated below, the
Claimants join issue with the Defendants on their Re-Amended Defence.

- 1 -

"Maxwell Decl. Ex. C"

<u>REPLY</u>

3.    Paragraph 2 is admitted, although the relevance of the First Claimant's principal business is not understood.

4.    Paragraph 4(e) is denied, to the extent that it is suggested that the Third Defendant did not actively engage in the sale of petroleum products as a predominate part of its business (particularly in 2005), as is reflected by the various financial statements it disclosed to the Claimants.

**Claim under the Memorandum of Understanding**

5.    As to Paragraph 8(a) it is denied that there was any variation of the MOU such that the profit sharing arrangement was altered from the pre-tax basis clearly set out in the MOU (paragraph (H)) to a post-tax basis in relation to the on-shore profits. For the avoidance of doubt, however, the Claimants accept that the following cargo specific taxes are to be treated as direct expenses under the MOU:

    (a)    the petroleum tax known in Guatemala as "IDP"; and

    (b)    the petroleum sales tax known in Guatemala as "IVA".

6.    As to Paragraph 8(b), it is denied that there was any variation of the MOU such that the costs which fell to be deducted in calculating the profits to be split between the parties were no longer only "direct costs" associated with each transaction of the sort referred to in the MOU (paragraph (I)) but also included any other costs of carrying on the business within Guatemala.

7.    Paragraph 9 is admitted save that:

    (a)    The fact that the underlying assumptions on which the terms of the MOU were based may have changed in certain respects does not mean that the terms of the MOU as to taxes and costs were varied. They were not.

    (b)    It is denied that Mr. Blihovde was present at the meeting on or about 30 June 2005.

8.    As to paragraph 10(b), paragraphs 5, 6 and 7 above are repeated.

9.    As to paragraph 11, the suggested implied term is inconsistent with (indeed in direct contradiction of) the express terms of the MOU and is, for that reason and in any event, denied.

10.   As to Paragraph 14:

(a)   It is denied that the Parties reconciled and agreed the profit and loss figures in relation to the period governed by the MOU in the first six months of 2006 or at all.

(b)   It is denied that the Claimants confirmed that a final agreement had been reached in this respect by way of the two items of correspondence referenced therein, or at all;

(c)   It is averred that the date the MOU was executed was 6 May 2005, and the date upon which it was superseded by the MOU was 13 December 2005.

(d)   Paragraph 14(b) ignores the fact that the Second Claimant sent to the Defendants a preliminary statement of account on 28 February 2007, which the Defendants' 5 April 2007 calculation was responsive to. The 28 February 2007 calculation indicated that under the MOU the Defendants owed the Claimants US$2,933,329.80, of which US$445,207 remained to be paid.

(e)   The Defendants' calculation of 5 April 2007 was in response to this, noting that the parties were "*close*" to agreement in relation to the sums owed in relation to the year ending 2005. It is noted that the Defendants did not assert at the time of this calculation that any binding agreement had previously been reached between the Parties as to this issue.

(f)   It is a mischaracterisation to allege that the Claimants' calculations of 14 May 2007 accepted the Defendants' calculations as correct. In reality, although some of the Defendants' revisions had been accepted, there remained a difference of US$107,591.31 between the Parties.

- 3 -

(g)     As to Paragraph 14(d), the time for reconciliation and final payment under the Contract (which, as set out in paragraph 14 of the Re-Amended Particulars of Claim was agreed would be the time for reconciliation and final payment of sums due under the MOU) was, by virtue of Clause of the First Amendment to the Contract, 15th May 2007, and accordingly the payment of the sums owed under the MOU is outstanding from that date.  It is denied (for the reasons set out herein) that there are any monies owed to the Defendants under the Contract and accordingly the entitlement to set-off asserted under Paragraph 14(d)(3) is denied.

11.    As to paragraph 16:

(a)     It is admitted that the Claimants know the declared import values of the cargoes.

(b)     It is admitted that the Claimants have been provided with information setting out the price at which the cargoes were sold to the local market, to the extent that this can be understood from the audited financial statements of the Second, Third and Fourth Defendants.

(c)     The Claimants' calculation of the sums due to it, relies on (a) and (b) above.

(d)     The Claimants further admit (and aver) that they have sufficient information to enable them to have identified certain deductions or types of deduction which they understand have been made by the Defendants in carrying out the profit calculation under the MOU which do not fall to be made under the terms of the MOU as set out above (as further set out below), although they do not have sufficient information to fully quantify the impact of certain of these deductions.

(e)     The Claimants do not however, have sufficient information to enable them to say, prior to disclosure and the production of the joint expert's report(s), whether any other amounts have wrongly been deducted by the Defendants in their profit calculation.  For the avoidance of doubt, the Defendants'

audited accounts, do not contain such information and the previous Littlejohn investigation was not conducted in sufficient detail to enable the Claimants to determine the correct position in relation to the following expense items that appear in the Second, Third and Fourth Defendants' audited accounts:

(i)      depreciation charges;

(ii)     provisions for bad debts which are entirely notional;

(iii)    over provision of insurance;

(iv)     the items described as "fees and services";

(v)      the items described as "per diems";

(vi)     costs of sales in excess of the declared import invoice values;

(vii)    certain categories of expenses falling under the heading "others", including foreign exchange gains and losses; and

(viii)   whether charges by one Defendant to another were in excess of what could properly fall to be deducted under the MOU.

(f)      The Claimants' calculation necessarily presently assumes that these items are properly to be deducted in full but will require (upwards) revision if, on disclosure and service of the joint expert report(s), it emerges that deductions in respect of any of the items set out above should not have been made at all or should have been made in a lesser amount than has been made.

(g)      The burden of proof is on the Defendants as regards deductions from the difference between sales and declared import invoice values, in terms of showing both that sums have been incurred and that they are sums which legitimately fall to be deducted under the terms of the MOU.

(h)      Further, the previous Littlejohn investigation:

- 5 -

(i)     excluded entirely from its scope the position of the First Defendant; and

(ii)    was asked to look at only one cargo ("Great Eastern") which was identified by the parties as having not been financed by the Claimants but had nonetheless been treated by the Defendants as a cargo falling under the terms of Contract, whereas it now appears to be the Defendants' position that there are other cargoes which it has treated (understood to be in addition to the "Elke Bene" cargo discovered by Littlejohn, which was unloaded after 21 September 2006 and did not form part of the Business), and was entitled to (such entitlement not being admitted) treat, similarly (and which Littlejohn was not asked to consider and which its investigation did not identify within the Second, Third and Fourth Defendants' audited accounts);

such that prior to disclosure and/or the joint expert's report(s), the Claimants are unable to say whether the position of the Fourth Defendant and any other cargoes put through the business by the Defendants have been properly treated in the Defendants' calculations.

(i)     the Claimants' calculations of 14 May 2007 clearly disputed a number of the financial assertions made by the Defendants in their 5 April 2007 calculations, and questioned the reasonableness and proof of certain claims made by the Defendants.

(j)     It is admitted that the Claimants sent a private consultant to Guatemala in August 2006. However, that consultant's role was to audit the Defendants' operations and not their financial information and records.

12.    Paragraph 19 is denied (save that the existence of such a term in the MOU is admitted):

(a)    The "events giving rise to the claim" for the purposes of the relevant provision are the failure of the Defendants to reconcile and pay the sums due

under the MOU by the appropriate time (being 15th March 2007 on the Claimants' case as set out above) or (even on the Defendants' case, which is denied) the failure of the Defendants to pay the sums alleged to have been agreed to be due under the MOU by that date. These proceedings were commenced well within a year of 15th March 2007.

(b)   Alternatively, the relevant provision was varied by the agreement of the parties to postpone the reconciliation and payment of sums due under the MOU as set out in the Re-Amended Particulars of Claim or (even on the Defendants' case, which is denied) by the agreement of the parties to postpone only payment of sums alleged to have been agreed to be due under the MOU. By virtue of such variation, the one year period did not start to run until the date (17th March 2007) by when the parties agreed that reconciliation and/or payment under the MOU should be complete.

(c)   Alternatively, by agreeing to defer (on the Claimants' case) reconciliation and payment of sums due under the MOU, or (on the Defendants' case, which is denied) only payment of the sums alleged to have been agreed to be due under the MOU, the Defendants represented, and/or thereafter conducted themselves on the basis, that they would not rely on the relevant provision of the MOU so as to contend that a dispute as to payment of sums due under the MOU was time barred until a year after the date to which the parties agreed to defer reconciliation and payment (or, on the Defendants' case, payment). The Claimants relied on that representation in not commencing proceedings earlier than they did and it would now be inequitable for the Defendants to resile from their representation. In the premises, the Defendants are estopped from contending that the claim under the MOU is time barred pursuant to the relevant provision.

(d)   In the further alternative, the Defendants themselves having previously admitted that they owed US$337,571.69 in respect of the MOU, and having represented that such sums would be paid at the time of the reconciliation of sums owing under the Contract (which representation the Claimants relied

- 7 -

on in not commencing proceedings earlier), are estopped from now raising any such contractual limitation defence in relation to at least that sum, it being inequitable for the Defendants to resile from their representation.

**Claim under the Contract**

13.   As to Paragraph 30:

(a)   Sub-paragraphs 11(a)-(j) above are repeated, with references to the MOU being read as to the Contract.

(b)   As to Paragraph 30(c), the agreed date for reconciliation and payment of all sums due under the MOU and the Contract was 15th March 2007. That was the date by when any sums found to be due herein should have been paid.

(c)   As to Paragraph 30(d), it is denied that the Defendants have made efforts to provide such additional information as the Claimants reasonably require to fully complete the reconciliation process, in this regard the Claimants rely on (inter alia) both the letters set out by the Defendants from their solicitors to those of the Claimants, and also those letters from the Claimants' solicitors to those of the Defendants, dated 6 September 2007, 2 October 2007, 27 December 2007 and 9 April 2008.

14.   As to Paragraph 33, it is denied that, on a proper interpretation of the MOU and the Contract, the Defendants have any claim against the Claimants and accordingly it is averred that they have no right of set-off.

## DEFENCE TO COUNTERCLAIM

15.   Paragraphs 2 through 14 of the Reply are repeated.

16.   Paragraph 35 is denied. On a true construction of the MOU and the Contract, the correct final reconciliation of accounts between the Claimants and the Defendants shows a balance in favour of the Claimants in the sum of at least US$6,068,094. The relevant calculation, assuming the veracity and supportability of the financial

information provided by the Defendants to date and without prejudice to sub-paragraphs 11 and 13(a) above, is attached as Schedule A hereto.

17.    Without prejudice to the generality of the foregoing and without prejudice to paragraphs 11 and 13(a) above, the differences between the parties' figures arise as follows:

(a)    The Defendants claim on a post-tax basis (i.e. post the deduction of income tax, tax on dividends and the Extraordinary and Temporary Tax of Support to the Peace Accords) in contravention of the true terms of the MOU and the Contract;

(b)    The profits of the Fourth Defendant should be included within the relevant calculation, as a consequence of the Defendants' substitution of the entities originally intended to carry out the transactions contemplated under the MOU and the Contract;

(c)    The Defendants have wrongly deducted sums by way of expenses (relating to terminal expenses) which were in fact paid by the Claimant;

(d)    The Defendants have in each of the Scenarios presented in Schedule A of the Defence wrongly deducted sums by way of expenses counted twice over. In particular the fees and expenses incurred by the Second Defendant, which have been charged to, and recovered from one or both of the Third and Fourth Defendants, are being claimed (effectively twice) as both an expense of the relevant Third/Fourth Defendant and of the Second Defendant;

(e)    The Defendants wrongly seek to reflect loss in inventory value post the termination of the Contract and/or have incorrectly applied Clause D of the First Amendment as varied by Clause B of the Second Amendment;

(f)    The Defendants seek to deduct operational expenses beyond those allowed under the terms of the Contract, including fees paid to Messrs. Rojas and Beckett by the First Defendant.

    (g)    The value claimed in relation to the Off-Shore Profits calculation differs from that reflected on the records of the Claimants;

    (h)    The Defendants have failed to provide any support for the suggestion that the Claimants should bear any share of certain additional, allegedly outstanding terminal liabilities (as referred to in their Schedules to the Defence and Counterclaim), or indeed any evidence that such liabilities exist;

    (i)    Even if certain taxes are properly deductable (contrary to the Claimants' case), the Defendants wrongfully seek to deduct payments said to have been made in respect of the "Extraordinary and Temporary Tax of Support to the Peace Accords" in circumstances were such payments were not actually made; and

    (j)    The Defendants appear to be seeking to claim the benefit of hedge transactions which closed after the termination of the Contract and MOU.

18.    Further or alternatively, even if, contrary to the Claimants' primary case, profits were to be distributed on a post-tax basis under the MOU or the Contract, in so far as the Court finds that the Defendants have retained more profit than they are entitled to have done under the MOU or the Contract and paid tax on that excess profit, such tax will not be a legitimate deduction from the sum otherwise payable to the Claimants.

19.    Paragraph 36 is noted.

20.    As to paragraphs 37 and 38 it is denied that the Claimants are under any obligation to pay the Defendants the Sum Owed, and it is further denied that the Defendants are owed any monies by the Claimants under the Contract or the MOU.   If, which remains unclear despite and partly because of paragraph 24 of the Defendants' Response dated 11th June 2009 to the Claimants' Request for Further Information dated 29th May 2009:

    (a)    the Defendants contend that any overall loss incurred in respect of the cargoes imported pursuant to the MOU or the Contract was to be shared

- 10 -

between the parties, that is denied (though the Claimants' primary case is that there was no such loss). The Claimants were entitled to a share of any overall profits; they did not agree to share in any overall losses.

(b)    the Defendants (alternatively) contend that the Claimants have so far received more than they were entitled to under the MOU or the Contract and are (on some presently unexplained basis) entitled to a return of the alleged surplus (which surplus is itself denied), that is not admitted.

21.    Paragraph 39 is noted.

Philip Edey Q.C.

Mark Beeley
Vinson & Elkins RLLP

17 June 2009

STATEMENT OF TRUTH

I believe that the facts stated in this Reply and Defence to Counterclaim are true.

 

_____

William R. Brooks
Vice Chairman and Chief Financial Officer
Speedway Motorsports, Inc.

 

_____

David Blihovde
Vice President – Operations
Oasis Trading Group, LLC

IN THE HIGH COURT OF JUSTICE                    Folio No. 2007/1644
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

B E T W E E N:

(3)     SPEEDWAY MOTORSPORTS, INC.

(4)     OASIS TRADING GROUP, LLC

Claimants

-and-

(1)     BLUE OIL TRADING LTD

(2)     CORPORACION ARCENILLAS S.A.

(3)     ECOPETROLEOS S.A.

(4)     BLUE OIL S.A.

Defendants

---

### SCHEDULE A
### FIRST AND SECOND CLAIMANTS'
### REPLY AND DEFENCE TO COUNTERCLAIM

---

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Folio No.

B E T W E E N:

SPEEDWAY MOTORSPORTS, INC.

<u>Claimant</u>

-and-

(1)    BLUE OIL TRADING LTD

(2)    CORPORACION ARCENILLAS S.A.

(3)    ECOPETROLEOS S.A.

(4) BLUE OIL S.A.

<u>Defendants</u>

---

### FIRST AND SECOND CLAIMANTS' AMENDED REPLY & DEFENCE TO COUNTERCLAIM

---

Vinson & Elkins R.L.L.P.

CityPoint,
1 Ropemaker Street
London EC2Y 9UE
Tel: 020 7065 6000
Fax: 020 70656 6001

Ref: SPE516/88000/JLL/MJB

| | |
|---|---|
| **From:** | David Blihovde [davidb@oasisgroup.org] |
| **Sent:** | Wednesday, September 28, 2005 4:05 AM |
| **To:** | Bill Brooks; Laymon Harrison; Chet Fream |
| **Subject:** | Fw: Letter to SMI |

**Attachments:** LetterSMI1.20050927..tif; Guatemala Control Sheet.20050927.xls

Here is a quick stab at the crap Matias sent

- Have we such documents referred to in Clause 2  B,C & D did we expect Arcenillas to supply upon presenting stocks or other?
- Preface - we have hired a consultant Virgil Guma- ex president of Vitol (attach his resume) to handle supply of Guatemala
- Clause 1 - Maybe he has answered his own question but doesn't realize it.  We don;'t want to supply an operation that loses money. In fact we only want to supply the operation and don't want to finance it. Vicious circle anyone want to put some real thought into this one.
- Clause 9a- did he not read his option in clause 9 -Also, unless expressly agreed in writing between the parties, Blue Oil/Arsenillas shall be required to use SMI for all its imports of Fuel into Guatemala.- So, if we decide not to participate on a cargo we send Blue Oil a letter. Comments?
- Clause 2 - we need to come up with different terminology, otherwise I would need to agree
- Clause 4 - First of all it is not a joint venture.  Since we did not agree to the assumption/lease of Alka Wenker by Blue Oil we have no liability or interest in funding their terminal operation or staffing.  As referenced in Clause 4-.  Not as a limitation on the foregoing, Blue Oil will assign an employee to be dedicated in full and be based for a majority of his time in Guatemala.  This employee will be responsible for managing the day to day operations of the sales of Fuel, as well as reconciling the daily profit and loss and position with Oasis and SMI. Doesn't assume Oasis will pay for Blue oil employee. It is their interest in the business. Just like I oversee their daily operation at no cost to the operation.
- Clause 5 - First provide names and accounts of undermining that has occurred. Provide accurate ties between Oasis and your accusations.  If this business is to continue it will be done per clause 5 or not at all.
- Clause 6 - As Bill referenced in conversation yesterday maybe we need to open an SMI bank acct in Guatemala for the funds to go directly into from Ecopetroleuos
- Clause 7 - This one I'll leave to the direction of Bill. I believe for now it is what it is.
- Negotiating the above can be started via email quickly and if there are "other issues" place them on the table now.
- I believe October 5th to be a better target.  If we decide not to hold to September 30.
- Re: Wasn't it nice for him to include Oasis

Guys let's jump all over this and reply ASAP

DB

----- Original Message -----
**From:** Matias Rojas
**To:** Bill Brooks
**Cc:** David Blihovde
**Sent:** Tuesday, September 27, 2005 7:11 PM
**Subject:** Letter to SMI

"Maxwell Decl. Ex. D"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| IN RE APPLICATION OF BLUE OIL TRADING LTD., | ) ) ) | MISC. CIVIL ACTION NO. _____ |
| In re Application for Order Pursuant to 28 U.S.C. § 1782 | ) ) ) ) | JUDGE _____ |
|  | ) ) | **ORDER GRANTING DISCOVERY PURSUANT TO 28 U.S.C. § 1782** |

IT IS HEREBY ORDERED:

1.      The Application for Discovery pursuant to 28 U.S.C. § 1782 by Blue Oil Trading Ltd. ("Blue Oil") is **GRANTED**.

2.      A district court has the authority to grant an application for judicial assistance if the following statutory requirements in § 1782(a) are met: (1) the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance. 28 U.S.C. § 1782(a).   If these requirements are met, then § 1782 "authorizes, but does not require, a federal district court to provide assistance . . . ." *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 255, 124 S. Ct. 2466, 2478 (2004).

3.      Here, these statutory requirements are satisfied.  Blue Oil is a Defendant which has appeared in litigation - captioned *Speedway Motorsports, Inc. et al. v. Blue Oil Trading Ltd,* Folio No. 2007/1644 - pending before the High Court of Justice, London, England ("UK Litigation").  As a result, Blue Oil is an "interested person" under § 1782(a).  Since the

1

Application seeks only testimony and documents - specifically for use in the UK Litigation - from Mr. Virgilio Guma ("Mr. Guma"), who is a United States citizen residing in this district, the remaining preliminary statutory requirements are also met.

4.     Although the Court may authorize a discovery application once the prima facie requirements of § 1782 are shown, it is not obligated to do so. The Supreme Court has suggested four additional factors the Court may consider when exercising its discretion in considering such an application. *Id.* at 264-65, 124 S. Ct. at 2483; *see also In re Clerici,* 481 F.3d 1324, 1334 (11th Cir. 2007) (analyzing these factors and affirming the district court's order granting a discovery application).

5.     These factors are as follows: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding [in which case] the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad"; (2) the "nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";  (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States";  and (4) whether the discovery requests should be scaled back to avoid undue burden. *Intel*, 542 U.S. at 264-65.

6.     In this case, the Court considered each factor set forth by the Supreme Court.  The Court grants the discovery application because Mr. Guma is not a party to the UK Litigation and may have documents relevant thereto.   Also, the High Court of Justice, London, England, is the court of first instance in England in which civil actions are brought by private litigants for damages.  As a result, the UK Litigation is the English counterpart to a civil action that would be

2

commenced here in a federal district court or state trial court and the English courts' receptiveness to the assistance of the courts of the United States in the past supports granting this Application. *See In re Request From the United Kingdom Pursuant to the Treaty Between the United States of Am. and the Gov't of the United Kingdom of Great Britain and Northern Ireland on Mutual Legal Assistance in Criminal Matters in the matter of Easier, PLC,* 2007 U.S. Dist. LEXIS 82033, at *6 (M.D. Fla. Nov. 5, 2007) (noting fact that "United Kingdom reciprocates assistance to the United States when it requires federal court judicial assistance weigh[s] in favor of granting the application"); *In re Phillips*, 2004 U.S. Dist. LEXIS 16426, *6-7 (S.D.N.Y. Aug. 19, 2004) (granting discovery application for use in action in High Court of Justice in England and finding "no reason to suppose that the government of the United Kingdom would disfavor granting Applicants relief under § 1782"). Lastly, the Application is not an attempt to circumvent foreign evidence gathering restrictions because Blue Oil brings this Application - which is narrowly tailored and should not impose an undue burden - only after Plaintiffs in the UK Litigation failed to produce any materials from Mr. Guma.

7.      Counsel for Blue Oil, Petros & Elegant, is hereby authorized to seek the requested discovery, in the manner and form set forth in the Application, from Mr. Guma.

8.      The Federal Rules of Civil Procedure shall apply to the enforcement of this Court Order, a copy of which – along with a copy of the Application - shall be served within five days of the date of this Order on all parties to the UK Litigation.

DONE AND ORDERED by the Court this _____ day of _____,
2009, in Miami, Florida.

_____
Hon.
United States District Court
Southern District of Florida

3

≈JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

09-22549

**I. (a) PLAINTIFFS**

Applicant Blue Oil Trading Ltd., a British Virgin Island Corporation, seeks discovery pursuant to 28 U.S.C. § 1782

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) Attorney's (Firm Name, Address, and Telephone Number)

Petros & Elegant
4090 Laguna Street, Second Floor
Coral Gables, FL 33146  (305) 446-3699

**DEFENDANTS**

N/A

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

Attorneys (If Known)

FILED by ___ D.C.

AUG 28 2009

STEVEN M. LARIMORE
CLERK U.S. DIST CT
S.D. of FLA. – MIAMI

CIV-ALTONAGA

MAGISTRATE JUDGE
BROWN

(d) Check County Where Action Arose: ✓ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

| **II. BASIS OF JURISDICTION** (Place an "X" in One Box Only) | **III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff |
|---|---|

II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
✓ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. RELATED/RE-FILED CASE(S).**
(See instructions second page):

a) Re-filed Case ☐ YES ✓ NO       b) Related Cases ☐ YES ✓ NO

JUDGE _____       DOCKET NUMBER _____

**VII. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

28 U.S.C. § 1782 (Application for Discovery for use in United Kingdom litigation)

LENGTH OF TRIAL via _N/A_ days estimated (for both sides to try entire case)

**VIII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE 8.28.09

FOR OFFICE USE ONLY
AMOUNT $350.       RECEIPT # 1007390

08/28/09